PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1832
_____

HISTORIC BOARDWALK HALL, LLC,
NEW JERSEY SPORTS AND EXPOSITION AUTHORITY,
TAX MATTERS PARTNER

v.

COMMISSIONER OF INTERNAL REVENUE,

Appellant
_____

On Appeal from the United States Tax Court
(No. 11273-07)
Judge:  Hon. Joseph Robert Goeke
_____

Argued
June 25, 2012

Before:   SLOVITER, CHAGARES, and JORDAN, *Circuit
Judges*.

(Filed:  August 27, 2012)
_____

Tamara W. Ashford
Arthur T. Catterall   [ARGUED]
Richard Farber
Gilbert S. Rothenberg
William J. Wilkins
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P. O. Box 502
Washington, D.C. 20044
        *Counsel for Appellant*

Robert S. Fink
Kevin M. Flynn   [ARGUED]
Kostelanetz & Fink, LLP
7 World Trade Center, 34th Floor
New York, NY   10007
        *Counsel for Appellees*

Paul W. Edmondson
Elizabeth S. Merritt
William J. Cook
National Trust for Historic Preservation
1785 Massachusetts Ave., N.W.
Washington, D.C. 20036

David B. Blair
Alan I. Horowitz
John C. Eustice
Miller & Chevalier, Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005
    *Counsel for Amicus National Trust for Historic
    Preservation*

A. Duane Webber
Richard M. Lipton
Robert S. Walton
Derek M. Love
Samuel Grilli
Baker & McKenzie LLP
300 East Randolph Drive, Suite 5000
Chicago, IL   60601
    *Counsel for Amicus Real Estate Roundtable*
_____

OPINION OF THE COURT
_____

TABLE OF CONTENTS

Page

I. Background ...................................................9

A. *Background of the HRTC Statute* ......................9

B. *Factual Background of the East Hall Renovation* ........................................................15

1. *NJSEA Background* ..................................15

2. *Commencement of the East Hall Renovation* ..................................................16

3. *Finding a Partner* .....................................18

a) *The Proposal from Sovereign Capital Resources* ...........................18

b) *The Initial and Revised Five-Year Projections* .....................................20

c) *Confidential Offering Memorandum* .................................22

d) *Selection of Pitney Bowes* ..............23

e) *Additional Revisions to Financial Projections* .....................................25

4. *Closing* ....................................................26

a) *The HBH Operating Agreement* ....27

b) *Lease Amendment and Sublease*....32

c) *Acquisition Loan and  Construction Loan* .............................................33

d) *Development Agreement* ................34

e) *Purchase Option and Option to Compel* ...........................................35

f) *Tax Benefits Guaranty* ...................36

5. *HBH in Operation* ....................................37

a) *Construction in Progress* ...............37

b) *Post-Construction Phase* ...............41

6. *The Tax Returns and IRS Audit* ................44

C. *The Tax Court Decision* .................................46

II. Discussion ..............................................................51

A. *The Test* .........................................................54

B. *The Commissioner's Guideposts* .....................56

C. *Application of the Guideposts to HBH* ............64

1. *Lack of Meaningful Downside Risk* ..........69

2. *Lack of Meaningful Upside Potential* .......77

3. *HBH's Reliance on Form over Substance* .................................................80

III.    Conclusion...................................................................85

JORDAN, *Circuit Judge*.

This case involves the availability of federal historic rehabilitation tax credits ("HRTCs") in connection with the restoration of an iconic venue known as the "East Hall" (also known as "Historic Boardwalk Hall"), located on the boardwalk in Atlantic City, New Jersey. The New Jersey Sports and Exposition Authority ("NJSEA"), a state agency which owned a leasehold interest in the East Hall, was tasked with restoring it. After learning of the market for HRTCs among corporate investors, and of the additional revenue which that market could bring to the state through a syndicated partnership with one or more investors, NJSEA created a New Jersey limited liability company, Historic Boardwalk Hall, LLC ("HBH"), and subsequently sold a membership interest in HBH[1] to a wholly-owned subsidiary

---

[1] An LLC "offers the best of both worlds – the limited liability of a corporation and the favorable tax treatment of a partnership." *Canterbury Holdings, LLC v. Comm'r*, 98 T.C.M. (CCH) 60, 61 n.1 (2009). Generally, an LLC is a pass-through entity that does not pay federal income tax. *See* I.R.C. § 701; Treas. Reg. § 301.7701-3(a). Rather, profits and losses "pass through" the LLC to its owners, called members, who pay individual income tax on their allocable shares of the tax items. *See* I.R.C. §§ 701-04, 6031. Although an LLC with just one owner is, for tax purposes, disregarded as an entity separate from its owner for tax purposes, an LLC with two or more members is classified as a partnership for tax purposes unless it elects to be treated as a corporation. Treas. Reg. § 301.7701-3(b)(1). Once HBH, as a duly formed New Jersey limited liability company, had

7

of Pitney Bowes, Inc. ("PB").[2]   Through a series of agreements, the transactions that were executed to admit PB as a member of HBH and to transfer ownership of NJSEA's property interest in the East Hall to HBH were designed so that PB could earn the HRTCs generated from the East Hall rehabilitation.   The Internal Revenue Service ("IRS") determined that HBH was simply a vehicle to impermissibly transfer HRTCs from NJSEA to PB and that all HRTCs taken by PB should be reallocated to NJSEA.[3]   The Tax Court disagreed, and sustained the allocation of the HRTCs to PB through its membership interest in HBH.   Because we agree with the IRS's contention that PB, in substance, was not a bona fide partner in HBH, we will reverse the decision of the Tax Court.

---

two members, it did not elect to be treated as a corporation and thus was classified as a partnership for tax purposes for the tax years in which it had more than one member.  Thus, as the parties do, we refer to HBH as a partnership when analyzing whether one of its stated members was a bona fide partner.

[2] PB's membership interest in HBH was through PB Historic Renovations, LLC, whose sole member was Pitney Bowes Credit Corp.  At all relevant times, Pitney Bowes Credit Corp. was a wholly-owned subsidiary of PB.  For ease of reference, we will refer to PB Historic Renovations, LLC, Pitney Bowes Credit Corp., and PB as "PB."

[3] The alphabet-soup of acronyms in this case is perhaps beyond parody, but the acronyms are a more efficient means of referring to various corporate and state entities, as well as the tax credits and other concepts, so we reluctantly fall into the soup.

## I. Background

### A. *Background of the HRTC Statute*

We begin by describing the history of the HRTC statute. Under Section 47 of the Internal Revenue Code of 1986, as amended (the "Code" or the "I.R.C."), a taxpayer is eligible for a tax credit equal to "20 percent of the qualified rehabilitation expenditures ["QREs"[4]] with respect to any certified historic structure.[5]" I.R.C. § 47(a)(2). HRTCs are only available to the owner of the property interest. *See generally* I.R.C. § 47; *see also* I.R.S. Publication, *Tax Aspects of Historic Preservation*, at 1 (Oct. 2000), *available at* http://www.irs.gov/pub/irs-utl/faqrehab.pdf. In other words, the Code does not permit HRTCs to be sold.

---

[4] The Code defines a QRE as:

> [A]ny amount properly chargeable to [a] capital account – (i) for property for which depreciation is allowable under [I.R.C. §] 168 and which is – (I) nonresidential real property, (II) residential real property, (III) real property which has a class life of more than 12.5 years, or (IV) an addition or improvement to property described in subclause (I), (II), or (III), and (ii) in connection with the rehabilitation of a qualified rehabilitated building.

I.R.C. § 47(c)(2)(A).

[5] The Code defines a "certified historic structure" as "any building (and its structural components) which – (i) is listed in the National Register, or (ii) is located in a registered historic district and is certified by the Secretary of the Interior

The idea of promoting historic rehabilitation projects can be traced back to the enactment of the National Historic Preservation Act of 1966, Pub. L. No. 89-665, 80 Stat. 9156 (1966), wherein Congress emphasized the importance of preserving "historic properties significant to the Nation's heritage," 16 U.S.C. § 470(b)(3). Its purpose was to "remedy the dilemma that 'historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency.'" *Pye v. United States*, 269 F.3d 459, 470 (4th Cir. 2001) (quoting 16 U.S.C. § 470(b)(3)). Among other things, the National Historic Preservation Act set out a process "which require[d] federal agencies with the authority to license an undertaking 'to take into account the effect of the undertaking on any … site … that is … eligible for inclusion in the National Register' prior to issuing the license." *Id.* (quoting 16 U.S.C. § 470f). It also authorized the Secretary of the Interior to "expand and maintain a National Register of Historic Places." 16 U.S.C. § 470a(a)(1)(A).

The Tax Reform Act of 1976 furthered the goals of the 1966 legislation by creating new tax incentives for private sector investment in certified historic buildings. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976). The pertinent provisions of the 1976 Act indicate that Congress wanted to encourage the private sector to restore historic buildings, and, to provide that encouragement, it established incentives that were similar to the tax incentives for building new structures. *See, e.g.*, 122 Cong. Rec. 34320

---

to the Secretary as being of historic significance to the district." I.R.C. § 47(c)(3).

(1976). Specifically, to equalize incentives affecting the restoration of historic structures and the construction of new buildings, it included a provision allowing for the amortization of rehabilitation expenditures over five years, or, alternatively, an accelerated method of depreciation with respect to the entire depreciable basis of the rehabilitated property. *See* I.R.S. Publication, *Rehabilitation Tax Credit*, at 1-2 (Feb. 2002)*, available at* http://www.irs.gov/pub/irs-mssp/rehab.pdf (hereinafter referred to as "*IRS- Rehab*").

The Revenue Act of 1978 went further to incent the restoration of historic buildings. It made a 10% rehabilitation credit available in lieu of the five-year amortization period provided by the 1976 Act. *See* Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763 (1978); *see also IRS-Rehab*, at 1-2. In 1981, Congress expanded the rehabilitation credit to three tiers, so that a taxpayer could qualify for up to a 25% credit for certain historic rehabilitations. *See* Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172 (1981); *see also IRS-Rehab*, at 1-2.

The Tax Reform Act of 1986 made extensive changes to the tax law, including the removal of many tax benefits that had been available to real estate investors. *See* Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (1986); *see also* Staff of J. Comm. on Tax'n, 99th Cong., *General Explanation of the Tax Reform Act of 1986* (Comm. Print. 1987) (hereinafter referred to as "*General Explanation of TRA 86*"). The HRTC survived, although it was reduced to its modern form of a two-tier system with a 20% credit for QREs incurred in renovating a certified historic structure, and a 10% credit for QREs incurred in renovating a qualified

11

rehabilitated building[6] other than a certified historic structure. *See* Tax Reform Act of 1986 § 251, 100 Stat. at 2183; *see also* I.R.C. § 47. A Congressional report for the 1986 Act discussed the rationale for keeping the HRTC:

---

[6] The Code defines a "qualified rehabilitated building" as:

> [A]ny building (and its structural components) if – (i) such building has been substantially rehabilitated, (ii) such building was placed in service before the beginning of the rehabilitation, (iii) in the case of any building other than a certified historic structure, in the rehabilitation process – (I) 50 percent or more of the existing external walls of such building are retained in place as external walls, (II) 75 percent or more of the existing external walls of such building are retained in place as internal or external walls, and (III) 75 percent or more of the existing internal structural framework of such building is retained in place, and (iv) depreciation (or amortization in lieu of depreciation) is allowable with respect to such building.

I.R.C. § 47(c)(1)(A). Additionally, "[i]n the case of a building other than a certified historic structure, a building shall not be a qualified rehabilitated building unless the building was first placed in service before 1936." *Id.* § 47(c)(1)(B).

12

In 1981, the Congress restructured and increased the tax credit for rehabilitation expenditures [because it] was concerned that the tax incentives provided to investments in new structures (e.g., accelerated cost recovery) would have the undesirable effect of reducing the relative attractiveness of the prior-law incentives to rehabilitate and modernize older structures, and might lead investors to neglect older structures and relocate their businesses.

The Congress concluded that the incentives granted to rehabilitations in 1981 remain justified. Such incentives are needed because the social and aesthetic values of rehabilitating and preserving older structures are not necessarily taken into account in investors' profit projections. A tax incentive is needed because market forces might otherwise channel investments away from such projects because of the extra costs of undertaking rehabilitations of older or historic buildings.

*General Explanation of TRA 86*, at 149.

Evidently mindful of how the tax incentives it had offered might be abused, Congress in 2010 codified the "economic substance doctrine," which it defined as "the common law doctrine under which tax benefits … with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business

purpose."[7]   I.R.C. § 7701(o)(5)(A).   At the same time, however, Congress was at pains to emphasize that the HRTC was preserved.  A Congressional report noted:

> If the realization of the tax benefits of a transaction is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such tax benefits be disallowed. …  Thus, for example, it is not intended that a tax credit (e.g., … section 47[, which provides for HRTCs,] …) be disallowed in a transaction pursuant to which, *in form and substance*, a

---

[7] Specifically, the codification of the economic substance doctrine provides:

> In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if … (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

I.R.C. § 7701(o)(1).   Section 7701(o) applies to all transactions entered into after March 30, 2010.  Thus, the common-law version of the economic substance doctrine, and not § 7701(o), applies to the transaction at issue here.

> taxpayer makes the type of investment or undertakes the type of activity that the credit was intended to encourage.

Staff of J. Comm. on Tax'n, *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, In Combination with the "Patient Protection and Affordable Care Act,"* at 152 n.344 (Comm. Print 2010) (emphasis added).  In sum, the HRTC statute is a deliberate decision to skew the neutrality of the tax system to encourage taxable entities to invest, both in form and substance, in historic rehabilitation projects.

> B. *Factual Background of the East Hall Renovation*

> 1. *NJSEA Background*

In 1971, the State of New Jersey formed NJSEA to build, own, and operate the Meadowlands Sports Complex in East Rutherford, New Jersey.  The State legislature expanded NJSEA's jurisdiction in 1992 to build, own, and operate a new convention center in Atlantic City and to acquire, renovate, and operate the East Hall.  Completed in 1929, the East Hall was famous for hosting the annual Miss America Pageant, and, in 1987, it was added to the National Register of Historic Places as a National Historic Landmark.

In October 1992, before renovations on the East Hall began, NJSEA obtained a 35-year leasehold interest in the property for $1 per year from the owner, the Atlantic County Improvement Authority.  About a month later, NJSEA entered into an agreement with the Atlantic City Convention

15

Center Authority, the then-operator of the East Hall, to operate both the East Hall and the new convention center. In July 1995, NJSEA and the Atlantic City Convention Center Authority handed over management responsibility for both the East Hall and the yet-to-be-completed convention center to a private entity, Spectacor Management Group ("Spectacor").

### 2. *Commencement of the East Hall Renovation*

Once construction started on the new convention center in the early 1990s, NJSEA began planning for the future of the East Hall and decided to convert it into a special events facility. That conversion was initially anticipated to cost $78,522,000. Renovations were to be performed in four phases, with the entire project expected to be completed in late 2001.

The renovation project began in December of 1998. By that time, NJSEA had entered into agreements with the New Jersey Casino Reinvestment Development Authority[8] pursuant to which the Casino Reinvestment Development Authority agreed to reimburse NJSEA up to $4,146,745 for certain pre-design expenses and up to $32,574,000 for costs incurred in the East Hall renovation. In a March 1999

---

[8] The Casino Reinvestment Development Authority, as described by the Tax Court, "is a State agency created by the New Jersey State Legislature that uses funds generated from governmental charges imposed on the casino industry for economic development and community projects throughout the State." (Joint Appendix ("J.A.") at 11 n.4.)

16

document prepared in connection with a separate bond issuance,[9] NJSEA noted that it had received grants from the Casino Reinvestment Development Authority to pay for the first phase of the East Hall renovation and that "[f]unding for the remaining cost of the project … is expected to be obtained through the issuance by [NJSEA] of Federally Taxable State Contract Bonds." (J.A. at 708.) In June 1999, NJSEA issued $49,915,000 in State Contract Bonds to fund the East Hall renovation.

The first two phases of the renovation were completed prior to the Miss America Pageant held in September 1999, and Phase 3 began the following month. Through 1999, NJSEA had entered into rehabilitation contracts for approximately $38,700,000, and had expended $28,000,000 of that amount. Also at about that time, the estimate of the total cost of the project increased to $90,600,000. NJSEA's 1999 annual report stated that the Casino Reinvestment Development Authority had agreed to reimburse NJSEA for "all costs in excess of bond proceeds for the project." (*Id.* at 1714.) Thus, by the end of 1999, between the proceeds it had received from the bond issuance and funds provided – or to be provided – by the Casino Reinvestment Development Authority, NJSEA had assurances that the East Hall rehabilitation project was fully funded.

---

[9] The proceeds from that bond issuance by NJSEA, described as the 1999 Luxury Tax Bonds, were not directly applied to the East Hall renovation. Rather, the 1999 Luxury Tax Bonds were issued to effect the refunding of certain amounts from an earlier bond issuance.

### 3. *Finding a Partner*

#### a) *The Proposal from Sovereign Capital Resources*

In August 1998, a few months prior to the beginning of renovations on the East Hall, Paul Hoffman from Sovereign Capital Resources ("Sovereign")[10] wrote to NJSEA regarding a "consulting proposal … for the sale of the historic rehabilitation tax credits expected to be generated" by the East Hall rehabilitation. (*Id*. at 691.) That proposal was "designed to give [NJSEA representatives] a better perspective on the structure of the historic tax credit sale, as well as the [potential] financial benefits (estimated in excess of $11 million) to the project." (*Id.*) As an initial summary, Hoffman stated that "the best way to view the equity generated by a sale of the historic tax credits is to think of it as an $11 million interest only loan that has no term and may not require any principal repayment." (*Id*.) Hoffman noted that although NJSEA, as a tax-exempt entity, would have no use for the 20% federal tax credit generated by QREs incurred in renovating historic structures, there were "entities that actively invest in [HRTC] properties … and are generally Fortune 500 corporations with substantial federal income tax liabilities." (*Id*. at 692.) Hoffman explained that because "[t]he [HRTC] is earned when the building is placed into service" and "cannot be transferred after the fact," "the

---

[10] Sovereign describes itself as "a boutique consulting firm that facilitates equity financing and offers financial advisory services for historic rehabilitation … tax credit transactions." (J.A. at 696.)

18

corporate investor should be admitted into the partnership that owns the project as soon as possible." (*Id.*)

Hoffman next sketched out the proposed transactions that would allow NJSEA to bring an investor interested in HRTCs into co-ownership of the East Hall and yet provide for NJSEA to "retain its long-term interests in the [East Hall]." (*Id.* at 693.) First, NJSEA would sublease its interest in the East Hall to a newly created partnership in which NJSEA would be the general partner and a corporate investor would be the limited partner. The sublease agreement would be treated as a sale for tax purposes since the sublease would extend longer than the useful life of the property under tax rules. Next, that partnership would allocate 99% of its profit and loss to the limited partner corporate investor so that such investor could claim substantially all of the tax credits, but only be allocated a "small portion" of the cash flow. (*Id.* at 694.) Finally, after a sufficient waiting period, NJSEA would be given a purchase option to buy-out the corporate investor's interest. With all that said, however, Hoffman warned that "[c]orporate purchasers of [HRTCs] rarely accept construction risk," and "[t]ypically … provide no more than 10% of their equity to the partnership during the construction period." (*Id.* at 695.) Thus, Hoffman "recommend[ed] that NJSEA plan to issue enough bonds to meet the construction financing requirements of the project." (*Id.*)

Hoffman then provided a valuation of the HRTCs. He estimated that NJSEA could expect an investor to contribute approximately $0.80 to $0.90 per each dollar of HRTC allocated to the investor. In valuing the HRTCs, Hoffman "assume[d] that NJSEA would like to minimize the cash distribution to the investor and retain long-term ownership of

19

[the East Hall]." (*Id*.) He also listed four "standard guarantees" that "[i]nvestors in the tax credit industry" would "require" as part of the transaction: (1) a construction completion guaranty; (2) an operating deficit guaranty; (3) a tax indemnity; and (4) an environmental indemnity. (*Id.* at 696.) Additionally, Hoffman noted that "the investor will expect that either NJSEA or the State of New Jersey be obligated to make debt service on the bond issuance if operating revenue is insufficient to support the debt payments." (*Id*.)

NJSEA decided to further explore the benefits described by Sovereign. In March 1999, NJSEA issued a request for proposal (as supplemented by an addendum on April 30, 1999, the "RFP") from "qualified financial advisors … in connection with a proposed historic rehabilitation tax credit transaction … relating to the rehabilitation of the East Hall." (*Id.* at 710.) The RFP provided that the selected candidate would "be required to prepare a Tax Credit offering Memorandum, market the tax credits to potential investors and successfully close a partnership agreement with the proposed tax credit investor." (*Id*. at 721.) In June 1999, after receiving four responses, NJSEA selected Sovereign as its "[f]inancial [a]rranger" for the "Historic Tax Credit transaction." (*Id*. at 750.)

b) *The Initial and Revised Five-Year Projections*

In September 1999, as the second phase of the East Hall renovation had just been completed, Spectacor, as the East Hall's operator, produced draft five-year financial projections for the East Hall beginning for the 2002 fiscal

20

year.[11] Those projections estimated that the East Hall would incur a net operating loss of approximately $1.7 million for each of those five years. Sovereign received a copy of the projections, and, in a memo dated October 1, 1999, responded that it was "cautious about [Spectacor's] figures as they might prove excessively conservative." (*Id.* at 793.) In a December 10, 1999 memo to NJSEA representatives, Sovereign said that, for the yet-to-be-created partnership between NJSEA and an HRTC investor to earn the desired tax credits, the partnership "should be able to reasonably show that it is a going concern."[12] (*Id.* at 804.) To that end, Sovereign suggested that "[t]o improve the operating results, NJSEA could explore shifting the burden of some of the operating expenses from the [partnership] to the Land Lessor (either [the Atlantic County Improvement Authority] or NJSEA depending upon [how the partnership was structured])." (*Id.*)

Approximately two months later, Sovereign received revised estimates prepared by Spectacor. Those pro forma

---

[11] Because it was projected that the East Hall renovation would be completed in late 2001, fiscal year 2002 was anticipated to be the East Hall's first full year of operations.

[12] A "going concern" is "[a] commercial enterprise actively engag[ed] in business with the expectation of indefinite continuance." Black's Law Dictionary 712 (8th ed. 2004). Evidently and understandably, Sovereign viewed year after year of large losses from the operations of the East Hall as inconsistent with an ordinary expectation of indefinite continuance.

statements projected much smaller net operating losses, ranging from approximately $396,000 in 2002 to $16,000 in 2006. Within two weeks, Spectacor made additional revisions to those projections which resulted in estimated net operating income for those five years, ranging from approximately $716,000 in 2002 to $1.24 million in 2006. About 90% of the remarkable financial turnaround the East Hall thus was projected to enjoy on paper was due to the removal of all projected utilities expenses for each of the five years ($1 million in 2002, indexed for 3% inflation each year thereafter). When the accountants for the project, Reznick, Fedder & Silverman ("Reznick"), included those utilities expenses in their compiled projections one week later, Sovereign instructed them to "[t]ake [the] $1MM Utility Cost completely out of Expenses, [because] NJSEA [would] pay at [the] upper tier and [then] we should have a working operating model." (*Id.* at 954.)

c) *Confidential Offering Memorandum*

On March 16, 2000, Sovereign prepared a 174-page confidential information memorandum (the "Confidential Memorandum" or the "Memo") which it sent to 19 potential investors and which was titled "The Sale of Historic Tax Credits Generated by the Renovation of the Historic Atlantic City Boardwalk Convention Hall." (*Id.* at 955.) Although the executive summary in the Confidential Memorandum stated that the East Hall renovation would cost approximately $107 million, the budget attached to the Memo indicated that the "total construction costs" of the project were $90,596,088. (*Id.* at 1035). Moreover, the Memo stated that "[t]he rehabilitation [was] being funded entirely by [NJSEA]." (*Id.*

22

at 962).  The difference between the $107 million "estimated … renovation" (*id.* at 961), and the "total construction costs" of $90,596,088 was, as the Memo candidly put it, the "[p]roceeds from the sale of the historic tax credits" (*id.* at 963).  The Memo did not contemplate that those proceeds, estimated to be approximately $16,354,000, would be applied to "total construction costs" but rather indicated that the funds would be used for three things: (1) payment of a $14,000,000 "development fee" to NJSEA; (2) payment of $527,080 in legal, accounting, and syndication fees related to the tax-credit transaction; and (3) the establishment of a $1,826,920 working capital reserve.

The Memo also provided financial projections through 2009.  Those projections assumed that the investor would receive a 3% priority distribution (the "Preferred Return") from available cash flow on its $16,354,000 contribution, which contemporaneous NJSEA executive committee notes described as "required by tax rules."  (*Id.* at 1135.)  The financial projections provided for sufficient net operating income – ranging from $715,867 in 2002 to $880,426 in 2009 – to pay a portion of the Preferred Return on an annual basis (varying from $465,867 in 2002 to $490,620 in 2009), but also showed substantial tax losses through 2009 that were mainly attributable to depreciation deductions.

d)	*Selection of Pitney Bowes*

Four entities, including PB, responded to the Confidential Memorandum and submitted offers "regarding the purchase of the historic tax credits anticipated to be generated by the renovation" of the East Hall.  (*Id.* at 1143.)  In a May 2000 letter supplementing its offer, PB

23

recommended that NJSEA fund the construction costs through a loan to the partnership, rather than in the form of capital contributions, so that "the managing member could obtain a pre-tax profit and therefore the partnership would be respected as such for US tax purposes." (*Id*. at 1145.)

On July 13, 2000, PB and NJSEA executed a letter of intent ("LOI") reflecting their agreement that PB would make "capital contributions"[13] totaling $16.4 million over four installments in exchange for a 99.9% membership interest in HBH, which NJSEA had recently formed. The LOI further indicated that PB would also make an "Investor Loan" of $1.1 million. Consistent with PB's earlier recommendation, the LOI said that NJSEA, as the managing member retaining a 0.1% interest in HBH, would provide approximately $90 million in the form of two loans: (1) a purchase money obligation that represented the amount of QREs incurred by NJSEA in the East Hall renovation prior to PB's investment (the "Acquisition Loan"); and (2) a loan to finance the remainder of the projected QREs (the "Construction Loan"). According to the LOI, it was anticipated that the project would qualify for a minimum of $17,602,667 in HRTCs: $9,379,981 in 2000 and $8,222,686 in 2001. The LOI also noted that a 3% Preferred Return would be paid to PB. Although the LOI contemplated that PB would receive 99.9% of any available cash flow, HBH's financial projections from 2000 to 2042 forecasted no cash flow available for distribution during that time frame. Similarly, while the LOI

---

[13] Although we use the term "capital contributions" because that was the term used by the parties in this context, we do not attribute any dispositive legal significance to it as used herein.

mentioned that PB would receive 99.9% of the net proceeds from a sale of HBH, a pre-closing memo from NJSEA's outside counsel to NJSEA suggested that, "[d]ue to the structure of the transaction," the fair market value of PB's interest in HBH would be insignificant. (J.A. at 1162.) Thus, for its investment of $17.5 million ($16.4 million in capital contributions and the $1.1 million Investor Loan), PB would receive, in addition to the 3% Preferred Return, 99.9% of the approximately $17.6 million worth of HRTCs that would be generated from the QREs.

e) *Additional Revisions to Financial Projections*

Prior to the closing on PB's commitment to purchase a membership interest in HBH, an accountant from Reznick who was preparing HBH's financial projections, sent a memo to Hoffman indicating that the two proposed loans from NJSEA to HBH "ha[d] been set up to be paid from available cash flow" but that "[t]here was not sufficient cash to amortize this debt." (*Id.* at 1160.) To remedy the problem, Hoffman instructed the accountant to increase the projection of baseline revenues in 2002 by $1 million by adding a new revenue source of $750,000 titled "naming rights," and by increasing both "parking revenue" and "net concession revenue" by $125,000 each. Additionally, whereas the initial projections assumed that baseline revenues and expenses would both increase by 3% on an annual basis, the revised projections used at closing assumed that baseline revenues would increase by 3.5% annually, while maintaining the 3% estimate for the annual increases in baseline expenses. With those modifications, Reznick was able to project that, even after paying PB its 3% Preferred Return, HBH could fully pay

25

off the Acquisition Loan by 2040, at which point HBH would then be able to make principal payments on the Construction Loan.

Also prior to closing, by moving certain expenditures from the "non-eligible" category to the "eligible" category,[14] Reznick increased by about $9 million the amount of projected QREs that the East Hall renovation would generate. That increase in QREs resulted in an approximately $1.8 million increase in projected HRTCs from $17,602,667 to $19,412,173. That uptick in HRTCs, in turn, resulted in an increase in PB's anticipated capital contribution from $16,400,000 to $18,195,797.[15]

### 4. *Closing*

On September 14, 2000,[16] NJSEA and PB executed various documents to implement the negotiated transaction, and PB made an initial contribution of $650,000 to HBH.

---

[14] Reznick apparently used the terms "eligible" and "non-eligible" construction expenditures to differentiate between costs that were QREs and those that were not.

[15] The LOI provided that PB's contribution would be "adjusted … upward by $0.995 per additional $1.00 of Historic Tax Credit in the event that … the QREs for the Project after 1999 support[ed] Historic Tax Credits in excess of the projected Historic Tax Credits." (J.A. at 1148.)

[16] Although it is unclear from the record exactly when Phase 3 of the four-phase rehabilitation project was completed, the March 2000 Confidential Memorandum estimated that Phase 3, which began in October 1999, would

a)    *The HBH Operating Agreement*

The primary agreement used to admit PB as a member of HBH and to restate HBH's governing provisions was the amended and restated operating agreement (the "AREA"). The AREA stated that the purpose of HBH was "to acquire, develop, finance, rehabilitate, own, maintain, operate, license, lease, and sell or otherwise dispose of a[n] 87-year subleasehold interest in the Historic East Hall … for use as a special events facility." (*Id*. at 157.)  The AREA provided that PB would hold a 99.9% ownership interest as the "Investor Member," and NJSEA would hold a 0.1% ownership interest as the "Managing Member."  The AREA also provided that PB, in addition to its $650,000 initial contribution, would make three additional capital contributions totaling $17,545,797 (collectively, with the initial capital contribution, $18,195,797).  Those additional contributions were contingent upon the completion of certain project-related events, including verification of the amount of rehabilitation costs that had been incurred to date that would be classified as QREs to generate HRTCs.  According to Section 5.01(c)(v) of the AREA, each of the four contributions were to be used by HBH to pay down the principal of the Acquisition Loan contemplated by the LOI. Pursuant to the AREA, NJSEA, in addition to providing HBH

_____

be completed by August 2000.  That same memo stated that NJSEA anticipated that the entire renovation would be completed by December 2001, and, in fact, the East Hall reopened in October 2001.  Thus, it is likely that Phase 3 of the renovation was entirely completed by the time NJSEA and PB executed the various documents effecting PB's investment in HBH.

27

with the Acquisition Loan and the Construction Loan, agreed to pay all "Excess Development Costs" (the "Completion Guaranty"),[17] fund all operating deficits through interest-free loans to HBH (the "Operating Deficit Guaranty"), and indemnify PB against any loss incurred by PB as a result of any liability arising from "Hazardous Materials" relating to the East Hall,[18] including remediation costs (the "Environmental Guaranty").

---

[17] The AREA defined the term "Excess Development Costs" as "all expenditures in excess of the proceeds of the [Acquisition and Construction] Loans and the Capital Contributions of the Members which are required to complete rehabilitation of the [East] Hall," including, but not limited to, "(1) any interest, taxes, and property insurance premiums not payable from proceeds of the Loans or Capital Contributions, and (2) any construction cost overruns and the cost of any change orders which are not funded from proceeds of the Loans or Capital Contributions of the Members."  (J.A. at 161.)

[18] The term "Hazardous Materials" under the AREA included, among other things, "any 'hazardous substance', 'pollutant' or 'contaminant' as defined in any applicable federal statute, law, rule or regulation now or hereafter in effect … or any amendment thereto or any replacement thereof or in any statute or regulation relating to the environment now or hereafter in effect," and "any hazardous substance, hazardous waste, residual waste or solid waste, as those terms are now or hereafter defined in any applicable state or local law, rule or regulation or in any statute or regulation relating to the environment now or hereafter in effect." (J.A. at 162.)

The AREA also set forth a detailed order of priority of distributions from HBH's cash flow. After distributing any title insurance proceeds or any environmental insurance proceeds to PB, cash flow was to be distributed as follows: (1) to PB for certain repayments on its $1.1 million "Investor Loan" contemplated by the LOI; (2) to PB and NJSEA, in accordance with their respective membership interests, until PB received an amount equal to the current and any accrued and unpaid 3% Preferred Return as mentioned in the LOI; (3) to PB for an amount equal to the income tax liability generated by income earned by HBH that was allocated to PB, if any; (4) to NJSEA for an amount equal to the current and any accrued and unpaid payments of interest and principal owed on the Acquisition Loan and the Construction Loan; (5) to NJSEA in an amount equal to any loans it made to HBH pursuant to the Operating Deficit Guaranty; and (6) the balance, if any, to PB and NJSEA, in accordance with their respective membership interests.

Additionally, the AREA provided the parties with certain repurchase rights and obligations.[19] In the event that NJSEA desired to take certain actions that were prohibited under the AREA or otherwise required it to obtain PB's consent to take such actions, NJSEA could instead – without the consent of PB – purchase PB's interest in HBH. In the papers submitted to us, the ill-fitting name the parties gave to this ability of NJSEA to buy out PB without PB's consent is

_____

[19] Those rights and obligations are distinct from the put and call options set forth in separate agreements which were executed the same day and which are discussed *infra* in Section 1.B.4.e.

the "Consent Option." The purchase price under the Consent Option is not measured by any fair market value of PB's interest, if any such value were even to exist, but rather is equal to the then-present value of any yet-to-be realized projected tax benefits and cash distributions due to PB through the end of the five-year tax credit recapture period.[20] In the event that NJSEA committed a material default as defined by the AREA, PB had the right to compel NJSEA to purchase its interest (the "Material Default Option") for that same price.[21]

---

[20] In this context, the term "tax credit recapture" is apparently used to convey the concept that a taxpayer is required to repay to the IRS a portion of a tax credit it had previously claimed with respect to a property interest because that property interest did not continue to qualify for the tax credit for the requisite period of time. Specifically, if the East Hall were disposed of or "otherwise cease[d] to be [an HRTC] property with respect to" HBH within five years after the East Hall was placed into service, any HRTCs allocated to PB through its membership interest in HBH would be recaptured by, in effect, increasing PB's tax (through its membership interest in HBH) by the amount of the total HRTCs taken multiplied by a "recapture percentage," which varies based on the holding period of the property. *See* I.R.C. § 50(a). The amount of HRTCs subject to recapture would decrease by 20% for each of the first five years after the East Hall was placed in service. *See id*. § 50(a)(1)(B).

[21] At the time that the IRS challenged this series of transactions, neither the Consent Option nor the Material Default Option had been exercised.

To protect PB's interest, Section 8.08 of the AREA mandated that NJSEA obtain a guaranteed investment contract (the "Guaranteed Investment Contract").[22] The Guaranteed Investment Contract had to be "reasonably satisfactory to [PB], in the amount required to secure the payment of the purchase price" to be paid by NJSEA in the event that NJSEA exercised the option to purchase PB's interest under another purchase option agreement that NJSEA had.[23] (*Id.* at 187-88; *see supra* note 19.) The AREA also provided that the Guaranteed Investment Contract had to be obtained on or before the payment of PB's second capital contribution. In a memo dated two days prior to closing, Sovereign explained to NJSEA that "[t]he [Guaranteed Investment Contract] should be sized to pay off the Investor Loan of $1.1 million, accrued but unpaid interest on the [Investor Loan], and [PB's] annual priority distributions." (*Id.* at 1211.)

---

[22] A "guaranteed investment contract" is "[a]n investment contract under which an institutional investor [here, NJSEA] invests a lump sum … with an insurer that promises to return the principal (the lump sum) and a certain amount of interest at the contract's end." Black's Law Dictionary 845 (8th ed. 2004).

[23] That option, known as the call option, was one of two vehicles (the other being the Consent Option) that was available to NJSEA if it wanted to buy out PB's interest in HBH. PB had a corresponding put option which gave it the right to compel NJSEA to buy out PB's interest. As noted earlier, *supra* note 19, the put and call options are discussed *infra* in Section 1.B.4.e.

b)     *Lease Amendment and Sublease*

NJSEA also executed several documents that purported to transfer ownership of its interest in the East Hall to HBH. First, NJSEA entered into an amended and restated agreement with its lessor, Atlantic County Improvement Authority, to extend the term of NJSEA's leasehold interest in the East Hall from 2027 to 2087.[24] After that agreement,

---

[24] It appears that the leasehold interest was extended so that its term was longer than the depreciable basis of the improvements to be made on the East Hall for tax purposes. That extension was in accord with Hoffman's ultimate plan for NJSEA to transfer ownership of the East Hall (for tax purposes) to the newly created partnership, a plan he laid out in Sovereign's consulting proposal to NJSEA (albeit the actual lease extension was longer than that suggested in that proposal). (*See* J.A. at 693 ("Since the useful life of commercial improvements is 39.5 years, the tax industry consensus is that the sub-lease should be for a period of 50 years."). Extending the lease term beyond the useful life of the improvements was necessary so that when NJSEA entered into a sublease with HBH in connection with the East Hall, HBH, as Hoffman put it, could "be recognized as the 'owner' for tax purposes" (*id.*), and thus would be eligible to incur QREs that, in turn, would generate HRTCs. *See* I.R.C. § 47(c)(2)(B)(vi) ("The term '[QRE]' does not include …any expenditure of a lessee of a building if, on the date the rehabilitation is completed, the remaining term of the lease (determined without regard to any renewal periods) is less than the recovery period determined under [I.R.C. § 168(c)].").

NJSEA and HBH entered into a "Sublease" with NJSEA, as landlord, and HBH, as tenant. (*Id.* at 413.)

c)  *Acquisition    Loan    and Construction Loan*

As contemplated in the LOI, NJSEA provided financing to HBH in the form of two loans. First, NJSEA and HBH executed a document setting forth the terms of the Acquisition Loan, reflecting NJSEA's agreement to finance the entire purchase price that HBH paid to NJSEA for the subleasehold interest in the East Hall, which amounted to $53,621,405. That amount was intended to represent the construction costs that NJSEA had incurred with respect to the East Hall renovation prior to PB making its investment in HBH. The Acquisition Loan provided for HBH to repay the loan in equal annual installments for 39 years, beginning on April 30, 2002, with an interest rate of 6.09% per year; however, if HBH did not have sufficient cash available to pay the annual installments when due, the shortfall would accrue without interest and be added to the next annual installment. HBH pledged its subleasehold interest in the East Hall as security for the Acquisition Loan.

Second, NJSEA and HBH executed a document setting forth the terms of the Construction Loan, reflecting NJSEA's agreement to finance the projected remaining construction costs for renovating the East Hall, to be repaid by HBH in annual installments for 39 years, beginning on April 30, 2002, at an annual interest rate of 0.1%. Although the parties only

anticipated $37,921,036 of additional construction costs,[25] the maximum amount that HBH could withdraw from the Construction Loan provided by NJSEA was $57,215,733. That difference, $19,294,697, was nearly identical to the total investment that PB was to make in HBH ($18,195,797 in capital contributions and $1,100,000 for the Investor Loan). *See infra* Section I.B.5.a. Similar to the Acquisition Loan, the Construction Loan provided for equal annual installments out of available cash flow, but, if sufficient cash was not available, any shortfall would accrue without interest and be added to the next annual installment. HBH gave NJSEA a second mortgage on its subleasehold interest in the East Hall as security for the Construction Loan.

d)      *Development Agreement*

HBH and NJSEA also entered into a development agreement in connection with the ongoing rehabilitation of the East Hall. The agreement stated that HBH had "retained [NJSEA as the developer] to use its best efforts to perform certain services with respect to the rehabilitation … of the [East] Hall … including renovation of the [East] Hall,

---

[25] The final projections prepared during the week prior to closing contemplated $27,421,036 of remaining construction costs. During that week, Sovereign sent a memo to PB identifying an additional $10.5 million of "[p]otential additional expenditure[s]" that included environmental remediation costs ($3.0 million), tenant improvements ($2.5 million), and an additional rehabilitation contingency ($5.0 million). (J.A. at 1209.) If those expenditures were treated as QREs, the memo indicated that the transaction would generate an additional $2.1 million in HRTCs.

acquisition of necessary building permits and other approvals, acquisition of financing for the renovations, and acquisition of historic housing credits for the renovations." (*Id*. at 267.) The agreement noted that "since December 1998, [NJSEA] ha[d] been performing certain of [those] services … in anticipation of the formation of [HBH]." (*Id*.) The agreement provided that HBH would pay a $14,000,000 development fee to NJSEA, but that fee was not to be earned until the rehabilitation was completed. Prior to the execution of the development agreement, as NJSEA was spending over $53 million towards the renovation of the East Hall, it did not pay itself any development fee or otherwise account for such a fee.

> e) *Purchase Option and Option to Compel*

Concurrent with the AREA and the sublease agreement, PB and NJSEA entered into a purchase option agreement (the "Call Option") and an agreement to compel purchase (the "Put Option"). The Call Option provides NJSEA the right to acquire PB's membership interest in HBH, and the Put Option provides PB the right to require NJSEA to purchase PB's membership interest in HBH. Under the Call Option, NJSEA had the right to purchase PB's interest in HBH at any time during the 12-month period beginning 60 months after the East Hall was placed in service.[26] If NJSEA did not exercise the Call Option, then PB

---

[26] The 60-month period was likely imposed so that, if NJSEA did exercise the Call Option, any of the HRTCs that PB had previously been allocated through its membership

had the right to exercise the Put Option at any time during the 12-month period beginning 84 months after the East Hall was placed in service. For both the Put Option and the Call Option, the purchase price was set at an amount equal to the greater of (1) 99.9% of the fair market value of 100% of the membership interests in HBH; or (2) any accrued and unpaid Preferred Return due to PB. As already noted, *supra* Section I.B.4.a, the AREA mandated that NJSEA purchase the Guaranteed Investment Contract to secure funding of the purchase price of PB's membership interest, should either of the options be exercised.[27]

### f) *Tax Benefits Guaranty*

As contemplated by the Confidential Memorandum, HBH and PB entered into a tax benefits guaranty agreement (the "Tax Benefits Guaranty"). Pursuant to that guaranty, upon a "Final Determination of a Tax Benefits Reduction Event,"[28] HBH agreed to pay to PB an amount equal to the

interest in HBH would not be subject to recapture. *See supra* note 20.

[27] Neither of those options were exercised prior to the IRS's challenge.

[28] Pursuant to the Tax Benefits Guaranty, a "Tax Benefits Reduction Event means as of any Final Determination for any taxable year the amount by which the Actual Tax Benefits for such year are less than the Projected Tax Benefits." (J.A. at 300.) A "Final Determination" was defined as the earliest to occur of certain non-construction related events which, "with respect to either [HBH] or [PB], … result[] in loss of Projected Tax Benefits." (*Id.* at 299.)

sum of (1) any reduction in projected tax benefits, "as revised by the then applicable Revised Economic Projections,"[29] as a result of an IRS challenge; (2) any additional tax liability incurred by PB from partnership items allocated to it by HBH as a result of an IRS challenge; (3) interest and penalties imposed by the IRS on PB in connection with any IRS challenge; (4) an amount sufficient to compensate PB for reasonable third-party legal and administrative expenses related to such a challenge, up to $75,000; and (5) an amount sufficient to pay any federal income tax liability owed by PB on receiving any of the payments listed in (1) through (4). (*Id.* at 300.) Although HBH was the named obligor of the Tax Benefits Guaranty, the agreement provided that "NJSEA … shall fund any obligations of [HBH] to [PB]" under the Tax Benefits Guaranty. (*Id.* at 303.)

### 5. *HBH in Operation*

#### a) *Construction in Progress*

Pursuant to an Assignment and Assumption Agreement executed on the day of closing between NJSEA, as assignor, and HBH, as assignee, various agreements and contracts – including occupancy agreements, construction contracts, architectural drawings, permits, and management and service agreements – were assigned to HBH. HBH

---

[29] The "Revised Economic Projections" refer to the revised projections made by Reznick that "reflect the actual Tax Credits and federal income tax losses … at the time of payment of the Second, Third and Fourth Installments." (*Id.* at 300.)

37

opened bank accounts in its name, and it deposited revenues and paid expenses through those accounts.

As previously indicated, *supra* Section I.B.4.a, PB's capital contributions were, pursuant to the AREA, supposed to be used to pay down the Acquisition Loan. Although that did occur, any decrease in the balance of the Acquisition Loan was then offset by a corresponding increase in the amount of the Construction Loan. As the Tax Court explained:

> Shortly [after PB's capital contributions were used to pay down the principal on the Acquisition Loan], a corresponding draw would be made on the [C]onstruction [Loan], and NJSEA would advance those funds to [HBH]. Ultimately, these offsetting draws left [HBH] with cash in the amount of [PB's] capital contributions, a decreased balance on the [A]cquisition [L]oan, and an increased balance on the [C]onstruction [L]oan. These funds were then used by [HBH] to pay assorted fees related to the transaction and to pay NJSEA a developer's fee for its work managing and overseeing the East Hall's rehabilitation.

(*Id.* at 17-18.) Also as discussed above, *supra* Section I.B.4.c, the parties set the upper limit of the Construction Loan approximately $19.3 million higher than the anticipated amount of the total remaining construction costs as of the closing date, which would allow HBH to use PB's approximately $19.3 million in contributions to pay NJSEA a development fee and expenses related to the transaction

without being concerned that it would exceed the maximum limit on the Construction Loan provided by NJSEA.

PB made its second capital contribution in two installments, a $3,660,765 payment in December 2000, and a $3,400,000 payment the following month. Once those contributions were received by NJSEA and used to pay down the principal on the Acquisition Loan, NJSEA, instead of using the entire capital contribution to fund a corresponding draw by HBH on the Construction Loan, used $3,332,500 of that amount to purchase the required Guaranteed Investment Contract as security for its potential obligation or opportunity to purchase PB's interest in HBH.[30]

HBH experienced a net operating loss[31] for both 2000[32] ($990,013) and 2001 ($3,766,639), even though

---

[30] As noted, *supra* Section 1.B.4.a, the AREA required that NJSEA purchase the Guaranteed Investment Contract in the amount required to secure the purchase price to be paid by NJSEA if it exercised its Call Option. However, pursuant to a pledge and escrow agreement entered into by NJSEA, PB, and an escrow agent in January 2001, NJSEA also pledged its interest in the Guaranteed Investment Contract as security for its potential purchase obligation in the event that PB exercised its Put Option, subject to NJSEA's right to apply the proceeds of that contract toward payment of the purchase price if it exercised its Call Option or Consent Option, or if PB exercised its Material Default Option.

[31] We use the terms "net operating income" or "net operating loss" to mean the net income or loss before interest and depreciation expenses.

projections had indicated that HBH would generate net operating income of $500,000 in 2001.[33]  For the tax years ending in 2000 and 2001, HBH reported approximately $107.7 million in QREs, about $10.75 million more QREs than contemplated in the financial projections attached to the AREA.[34]  *See supra* note 25.  As a result, PB's required

---

[32] HBH's statement of operations for 2000 covered the period June 26, 2000 (date of inception) through December 31, 2000.

[33]  HBH's accountants did not make financial projections for operating revenues and expenses prior to 2001.

[34] It was possible for HBH to claim QREs that were incurred prior to its purported acquisition of the East Hall.  *See* Treas. Reg. § 1.48-12(c)(3)(ii) ("Where [QREs] are incurred with respect to a building by a persons (or persons) other than the taxpayer [i.e. NJSEA] and the taxpayer [i.e. HBH] subsequently acquires the building, … the taxpayer acquiring the property shall be treated as having incurred the [QREs] actually incurred by the transferor …, provided that … [t]he building … acquired by the taxpayer was … not placed in service … after the [QREs] were incurred and prior to the date of acquisition, and … [n]o credit with respect to such [QREs] is claimed by anyone other than the taxpayer acquiring the property." ).  Additionally, even if "total construction costs" were only approximately $90.6 million as projected, it would also have been possible to generate over $107 million in QREs.  *See id.* § 1.48-12(c)(2) (noting that QREs could include, among other things, "development fees," "legal expenses," and certain "[c]onstruction period interest" expenses).  In any event, as discussed *infra*, the IRS

aggregate capital contribution was increased by approximately $2 million to $20,198,460 and the Investor Loan was increased by $118,000 to $1,218,000.[35]

b)     *Post-Construction Phase*

According to NJSEA's 2001 annual report, the "$90 million renovation"[36] of East Hall "was completed on time and on budget" and reopened "in October 2001." (*Id*. at 1757, 1758.) Approximately a year later, PB made its third – and largest – capital contribution of $10,467,849. Around the time that contribution was made, Reznick prepared revised financial projections. Whereas, at closing, Reznick had forecasted $1,715,867 of net operating income for 2002, the accountants

has not challenged the amount of the QREs reported by HBH, but rather the allocation of any HBH partnership items to PB.

[35] As contemplated by the LOI, *see supra* note 15, the AREA provided that "if the 2000 or 2001 Tax Credits which [HBH] will be entitled to claim with respect to such rehabilitation are greater than the Projected Tax Credits … the aggregate amount of [PB's] Capital Contribution shall be increased by $.995 for each $.999 by which the Tax Credits exceed the Projected Tax Credits." (J.A. at 178.) It is unclear from the record why a portion of the required increase in capital contributions was instead applied to increase the Investor Loan.

[36] The "$90 million" figure is at odds with the statement in the Confidential Memorandum that the renovation project would cost $107 million. The difference approximates the sum eventually invested by PB. *See supra* Section I.B.3.c.

41

now projected a net operating loss of $3,976,023. Ultimately, after reality finished with the pretense of profitability, HBH's net operating loss for 2002 was $4,280,527. Notwithstanding the discrepancy between the initial and actual budgets for 2002, Reznick did not alter projections for 2003 and future years. For years 2003 through 2007,[37] Reznick projected an aggregate net operating income of approximately $9.9 million. HBH actually experienced an aggregate net operating loss of over $10.5 million for those five years. In early 2004, PB made a portion of its fourth and final capital contribution, paying $1,173,182 of its commitment of $2,019,846.[38]

When Reznick was preparing HBH's 2003 audited financial statements, it "addressed a possible impairment issue under FASB 144."[39] (*Id*. at 1638.) FASB 144 requires

---

[37] The record does not contain audited financial statements for HBH beyond 2007.

[38] After paying that portion of the fourth installment, PB had made $19,351,796 of its $20,198,460 required capital contribution. The notes to HBH's 2007 audited financial statements indicate that the $846,664 balance, plus interest, was still due, and was being reserved pending the outcome of litigation with the IRS. The Tax Court also said that a "portion of [PB's] fourth capital contribution … is currently being held in escrow." (J.A. at 17.)

[39] FASB is an acronym for the Financial Accounting Standards Board, an organization that establishes standards which are officially recognized as authoritative by the SEC for financial accounting and which govern the preparation of financial reports by nongovernmental entities. The number

42

a write down of an impaired asset to its actual value "whenever events or changes in circumstances indicate that its carrying amount may not be recoverable," such as when there is "[a] current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset." *Statement of Financial Accounting Standards No. 144*, Financial Accounting Standards Board, 9 (Aug. 2001), http://www.fasb.org/pdf/fas144.pdf) (hereinafter referred to as "FASB 144"). In a memo to HBH's audit file, Reznick considered a write down of HBH's interest in the East Hall pursuant to FASB 144, "[d]ue to the fact that [HBH] has experienced substantial operating losses and has not generated any operating cash flow since its inception." (J.A. at 1638.) In the end, however, Reznick was persuaded by the powers at HBH that HBH was never meant to function as a self-sustaining venture and that the State of New Jersey was going to make good on HBH's losses. In deciding against a write down, Reznick explained:

> Per discussions with the client, it was determined that [HBH] was not structured to provide operating cash flow. Instead, the managing member, [NJSEA], agreed to fund all operating deficits of [HBH] in order to preserve the [East Hall] as a facility to be used by the residents of the State of New Jersey. [NJSEA] has the ability to fund the deficits as a result of

"144" refers to the number assigned to the particular standard at issue here.

the luxury and other taxes provided by the hospitality and entertainment industry in the state.

(*Id*.) "Since there is no ceiling on the amount of funds to be provided [by NJSEA to HBH] under the [AREA]," Reznick concluded "there [was] no triggering event which require[d] [a write down] under FASB 144." (*Id*.) That same discussion and conclusion were included in separate memos to HBH's audit files for 2004 and 2005.[40] By the end of 2007, the operating deficit loan payable to NJSEA was in excess of $28 million.

### 6. *The Tax Returns and IRS Audit*

On its 2000 Form 1065,[41] HBH reported an ordinary taxable loss of $1,712,893, and $38,862,877 in QREs.[42] On

---

[40] The record does not contain Reznick's audit files for HBH beyond 2005.

[41] As detailed earlier, *supra* note 1, since HBH was a duly formed New Jersey limited liability company, had two members by the end of its 2000 tax year, and did not elect to be treated as a corporation, it was classified as a partnership for tax purposes for the tax years at issue here. *See* Treas. Reg. § 301.7701-3(b)(1). Partnerships do not pay federal income taxes, but rather are required to file a Form 1065, which is an annual information return of the partnership. A Form 1065 also generates a Schedule K-1 for each partner, which reports a partner's distributive share of tax items. The individual partners then report their allocable shares of the tax items on their own federal income tax returns. *See* I.R.C. §§ 701-04, 6031.

its 2001 Form 1065, HBH reported an ordinary taxable loss of $6,605,142 and $68,865,639 in QREs. On its 2002 Form 1065, HBH reported an ordinary taxable loss of $9,135,373 and $1,271,482 of QREs. In accordance with its membership interest in HBH, PB was issued a Schedule K-1 allocating 99.9% of the QREs for each of those tax years (collectively referred to herein as the "Subject Years").[43]

Following an audit of the returns of the Subject Years, the IRS issued to HBH a notice of final partnership administrative adjustment ("FPAA"). That FPAA determined that all separately stated partnership items reported by HBH on its returns for the Subject Years should be reallocated from PB to NJSEA. The IRS made that adjustment on various alternative, but related, grounds, two of which are of particular importance on appeal: first, the IRS said that HBH should not be recognized as a partnership for federal income tax purposes because it was created for the express purpose of improperly passing along tax benefits to PB and should be treated as a sham transaction; and, second, it said that PB's claimed partnership interest in HBH was not, based on the

---

[42] HBH's 2000 Form 1065 stated that it began business on June 26, 2000.

[43] While PB was also allocated 99.9% of the ordinary taxable loss for both 2001 and 2002, it appears it was only allocated approximately 69% of the ordinary taxable loss for 2000. Although it is unclear from the record, PB could have only been allocated 99.9% of the loss from the time it joined as a member in HBH in September 2000, although, as noted above, it was allocated 99.9% of the QREs for HBH's entire taxable year in 2000.

totality of the circumstances, a bona fide partnership participation because PB had no meaningful stake in the success or failure of HBH.[44] The IRS also determined that accuracy-related penalties applied.

### C. *The Tax Court Decision*

NJSEA, in its capacity as the tax matters partner of HBH,[45] filed a timely petition to the United States Tax Court

---

[44] The FPAA provided two additional grounds for reallocating partnership items from PB to NJSEA. It determined that no sale of the East Hall occurred between NJSEA and HBH for federal income tax purposes because the burdens and benefits of ownership of the East Hall interest did not pass from NJSEA, as the seller, to HBH, as the purchaser. Although the IRS has appealed the Tax Court's rejection of that argument, *see infra* note 47, we will not address that contention in view of our ultimate disposition. The FPAA also determined that HBH should be disregarded for federal income tax purposes under the anti-abuse provisions of Treas. Reg. § 1.701-2(b). The Tax Court also rejected that determination, and the IRS has not appealed that aspect of the decision.

[45] A partnership such as HBH "designates a tax matters partner to handle tax questions on behalf of the partnership," and that "partner is empowered to settle tax disputes on behalf of the partnership." *Mathia v. Comm'r*, 669 F.3d 1080, 1082 n.2 (10th Cir. 2012).

in response to the FPAA.[46] Following a four-day trial in April 2009, the Tax Court issued an opinion in favor of HBH.

The Tax Court first rejected the Commissioner's argument that HBH is a sham under the economic substance doctrine. *See supra* note 7 and accompanying text. As the Court saw it, "all of [the IRS's] arguments concerning the economic substance of [HBH] [were] made without taking into account the 3-percent return and the [HRTCs]." (*Id.* at 37.) The Court disagreed with the IRS's assertion that "[PB] invested in the [HBH] transaction solely to earn [HRTCs]." (*Id.* at 41.) Instead, the Court "believe[d] that the 3-percent return and the expected tax credits should be viewed together," and "[v]iewed as a whole, the [HBH] and the East Hall transactions did have economic substance" because the parties "had a legitimate business purpose – to allow [PB] to

---

[46] "Upon receiving an FPAA, a partnership, via its tax matters partner, may file a petition in the Tax Court … . Once an FPAA is sent, the IRS cannot make any assessments attributable to relevant partnership items during the time the partnership seeks review … ." *Mathia*, 669 F.3d at 1082. Once that petition is filed, a partnership-level administrative proceeding is commenced, governed by the Tax Equity and Fiscal Responsibility Act of 1982. Under that Act, all partnership items are determined in a single-level proceeding at the partnership level, which is binding on the partners and may not be challenged in a subsequent partner-level proceeding. *See* I.R.C. §§ 6230(c)(4), 7422(h). This streamlined process "remove[s] the substantial administrative burden occasioned by duplicative audits and litigation and … provide[s] consistent treatment of partnership tax items among partners in the same partnership." (J.A. at 31-32.)

47

invest in the East Hall's rehabilitation." (*Id*.) In support of that determination, the Tax Court explained:

> Most of [PB's] capital contributions were used to pay a development fee to NJSEA for its role in managing the rehabilitation of the East Hall according to the development agreement between [HBH] and NJSEA. [The Commissioner's] contention that [PB] was unnecessary to the transaction because NJSEA was going to rehabilitate the East Hall without a corporate investor overlooks the impact that [PB] had on the rehabilitation: no matter NJSEA's intentions at the time it decided to rehabilitate the East Hall, [PB's] investment provided NJSEA with more money than it otherwise would have had; as a result, the rehabilitation ultimately cost the State of New Jersey less. [The Commissioner] does not allege that a circular flow of funds resulted in [PB] receiving its 3–percent preferred return on its capital contributions. In addition, [PB] received the rehabilitation tax credits.

(*Id.* at 41-42.)

The Tax Court further explained that "[PB] faced risks as a result of joining [HBH]. First … it faced the risk that the rehabilitation would not be completed," and additionally, "both NJSEA and [PB] faced potential liability for environmental hazards from the rehabilitation." (*Id.* at 43.) While recognizing that HBH and PB were insured parties under NJSEA's existing environmental insurance policy, the

48

Tax Court noted that "there was no guaranty that: (1) The insurance payout would cover any potential liability; and (2) if NJSEA was required to make up any difference, it would be financially able to do so." (*Id.* at 43-44.) In sum, because "NJSEA had more money for the rehabilitation than it would have had if [PB] had not invested in [HBH]," and "[b]oth parties would receive a net economic benefit from the transaction if the rehabilitation was successful," the Tax Court concluded that HBH had "objective economic substance." (*Id.* at 46-47.)

The Tax Court used similar reasoning to reject the Commissioner's assertion that PB was not a bona fide partner in HBH. Specifically, the Court rejected the Commissioner's contentions that "(1) [PB] had no meaningful stake in [HBH's] success or failure; and (2) [PB's] interest in [HBH] is more like debt than equity." (*Id.* at 47.) After citing to the totality-of-the-circumstances partnership test laid out in *Commissioner v. Culbertson*, 337 U.S. 733 (1949), the Court determined that "[PB] and NJSEA, in good faith and acting with a business purpose, intended to join together in the present conduct of a business enterprise" (J.A. at 49). After "[t]aking into account the stated purpose behind [HBH's] formation, the parties' investigation of the transaction, the transaction documents, and the parties' respective roles," the Tax Court held "that [HBH] was a valid partnership." (*Id.* at 52.)

Regarding the formation of a partnership, the Court said that, because "[PB] and NJSEA joined together in a transaction with economic substance to allow [PB] to invest in the East Hall rehabilitation," and "the decision to invest provided a net economic benefit to [PB] through its 3-percent

preferred return and rehabilitation tax credits," it was "clear that [PB] was a partner in [HBH]." (*Id.* at 49-50.) The Court opined that, since the East Hall operated at a loss, even if one were to "ignore the [HRTCs], [PB's] interest is not more like debt than equity because [PB] [was] not guaranteed to receive a 3-percent return every year … [as] there might not be sufficient cashflow to pay it." (*Id.* at 51.)

The Tax Court also placed significant emphasis on "the parties' investigation and documentation" to "support [its] finding that the parties intended to join together in a rehabilitation of the East Hall." (*Id.* at 50.) According to the Court, the Confidential Memorandum "accurately described the substance of the transaction: an investment in the East Hall's rehabilitation." (*Id.*) The Court then cited to the parties' investigation into mitigating potential environmental hazards, as well as the parties' receipt of "a number of opinion letters evaluating various aspects of the transaction, to "support[] [its] finding of an effort to join together in the rehabilitation of the East Hall." (*Id.*) The Court decided that "[t]he executed transaction documents accurately represent[ed] the substance of the transaction … to rehabilitate and manage the East Hall." (*Id.*) Also, the Court found it noteworthy that "the parties … carried out their responsibilities under the AREA[:] NJSEA oversaw the East Hall's rehabilitation, and [PB] made its required capital contributions."[47] (*Id.* at 51.)

---

[47] Rejecting a third alternative ground brought by the IRS, *see supra* note 44, the Tax Court determined that NJSEA had transferred the benefits and burdens of its interest in the East Hall to render HBH the owner of the East Hall for tax purposes, *see supra* note 24. To support that conclusion, the

Hence, the Tax Court entered a decision in favor of HBH. This timely appeal by the Commissioner followed.

## II.   Discussion[48]

The Commissioner[49] alleges that the Tax Court erred by allowing PB, through its membership interest in HBH, to receive the HRTCs generated by the East Hall renovation. He characterizes the transaction as an impermissible "indirect sale of the [HRTCs] to a taxable entity. … by means of a purported partnership between the seller of the credits, [NJSEA], and the purchaser, [PB]." (Appellant's Opening Br. at 30.) While the Commissioner raises several arguments

Court observed that (1) "[t]he parties treated the transaction as a sale"; (2) "possession of the East Hall vested in [HBH]"; (3) "[HBH] reported the East Hall's profits and stood to lose its income if the East Hall stopped operating as an event space"; and (4) "[b]ank accounts were opened in [HBH's] name by [Spectacor] as operator of the East Hall." (J.A. at 54-55.)   Because of our ultimate resolution, we will not specifically address the Tax Court's analysis of that contention.

[48] The Tax Court had jurisdiction pursuant to I.R.C. §§ 6226(f) and 7442, and we have jurisdiction pursuant to I.R.C. § 7482(a)(1). We exercise *de novo* review over the Tax Court's ultimate characterization of a transaction, and review its findings of fact for clear error. *Merck & Co., Inc. v. United States*, 652 F.3d 475, 480-81 (3d Cir. 2011).

[49] The current Commissioner of Internal Revenue is Douglas Shulman.

in his effort to reallocate the HRTCs from NJSEA to PB, we focus primarily on his contention that PB should not be treated as a bona fide partner in HBH because PB did not have a meaningful stake in the success or failure of the partnership.[50] We agree that PB was not a bona fide partner in HBH.

[50] The Commissioner also contends that HBH was a sham. Specifically, the Commissioner invokes a "sham-partnership theory," which he says is "a variant of the economic-substance (sham-transaction) doctrine." (Appellant's Opening Br. at 50.) That theory, according to the Commissioner "focus[es] on (1) whether the formation of the partnership made sense from an economic standpoint, as would be the case [under the *Culbertson* inquiry], and (2) whether there was otherwise a legitimate business purpose for the use of the partnership form." (*Id.*)

HBH contends that the IRS's sham-partnership theory, which HBH asserts is "merely a rehash of the factual claims that [the IRS] made in challenging [PB's] status as a partner in HBH," is distinct from the sham-transaction doctrine (also known as the economic substance doctrine) that was litigated before the Tax Court. Amicus Real Estate Roundtable (the "Roundtable") agrees, submitting that the Commissioner's sham-partnership argument "inappropriately blur[s] the line between the [economic substance doctrine] and the [substance-over-form doctrine]," the latter of which applies when the form of a transaction is not the same as its economic reality. (Roundtable Br. at 7.) The point is well-taken, as the economic substance doctrine and the substance-over-form doctrine certainly "are distinct." *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 230 n.12 (3d Cir. 2002); *see generally Rogers v. United States*, 281 F.3d 1108, 1115-17 (10th Cir.

2002) (noting differences between the substance-over-form doctrine and the economic substance doctrine). The substance-over-form doctrine "is applicable to instances where the 'substance' of a particular transaction produces tax results inconsistent with the 'form' embodied in the underlying documentation, permitting a court to recharacterize the transaction in accordance with its substance." *Neonatology Assocs.*, 299 F.3d at 230 n.12. On the other hand, the economic substance doctrine "applies where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large tax benefits that accrue." *Id.*

As the Roundtable correctly explains, "[t]he fact that [a] taxpayer might not be viewed as a partner (under the [substance-over-form doctrine]) or that the transaction should be characterized as a sale (again, under the [substance-over-form doctrine]) [does] not mean that the underlying transaction violated the [economic substance doctrine]." (Roundtable Br. at 7.) Put another way, even if a transaction has economic substance, the tax treatment of those engaged in the transaction is still subject to a substance-over-form inquiry to determine whether a party was a bona fide partner in the business engaged in the transaction. *See Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 484 (5th Cir. 2011) ("The fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny [under *Culbertson*]."); *id.* ("If there was not a legitimate, profit-motivated reason to operate as a partnership, then the partnership will be disregarded for tax purposes even if it engaged in transactions that had economic substance.").

## A. *The Test*

A partnership exists when, as the Supreme Court said in *Commissioner v. Culbertson,* two or more "parties in good faith and acting with a business purpose intend[] to join together in the present conduct of the enterprise." 337 U.S. at 742; *see also Comm'r v. Tower*, 327 U.S. 280, 286-87 (1946) ("When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both."); *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors v. United States*, 659 F.3d 466, 488 (5th Cir. 2011) ("The *sine qua non* of a partnership is an intent to join together for the purpose of sharing in the profits and losses of a genuine business.").

---

At oral argument, the IRS conceded that this case "lends itself more cleanly to the bona fide partner theory," under which we look to the substance of the putative partner's interest over its form. Oral Argument at 11:00, *Historic Boardwalk Hall, LLC v. Comm'r* (No. 11-1832), *available at* http://www.ca3.uscourts.gov/oralargument/audio/11-1832Historic%20Boardwalk%20LLC%20v%20Commissioner%20IRS.wma. Accordingly, we focus our analysis on whether PB is as a bona fide partner in HBH, and in doing so, we assume, without deciding, that this transaction had economic substance. Specifically, we do not opine on the parties' dispute as to whether, under *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995), we can consider the HRTCs in evaluating whether a transaction has economic substance.

The *Culbertson* test is used to analyze the bona fides of a partnership and to decide whether a party's "interest was a bona fide equity partnership participation." *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 (2d Cir. 2006) (hereinafter *"Castle Harbour "*). To determine, under *Culbertson*, whether PB was a bona fide partner in HBH, we must consider the totality of the circumstances,

> considering all the facts – the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent.

337 U.S. at 742. That "test turns on the fair, objective characterization of the interest in question upon consideration of all the circumstances." *Castle Harbour*, 459 F.2d at 232.

The *Culbertson* test "illustrat[es] … the principle that a transaction must be judged by its substance, rather than its form, for income tax purposes." *Trousdale v. Comm'r*, 219 F.2d 563, 568 (9th Cir. 1955). Even if there are "*indicia* of an equity participation in a partnership," *Castle Harbour*, 459 F.3d at 231, we should not "accept[] at face value artificial constructs of the partnership agreement," *id.* at 232. Rather, we must examine those indicia to determine whether they truly reflect an intent to share in the profits or losses of an enterprise or, instead, are "either illusory of insignificant." *Id.* at 231. In essence, to be a bona fide partner for tax

55

purposes, a party must have a "meaningful stake in the success or failure" of the enterprise. *Id.*

### B. *The Commissioner's Guideposts*

The Commissioner points us to two cases he calls "recent guideposts" bearing on the bona fide equity partner inquiry. (Appellant's Opening Br. at 34.) First, he cites to the decision of the United States Court of Appeals for the Second Circuit in *Castle Harbour*, 459 F.3d 220. The *Castle Harbour* court relied on *Culbertson* in disregarding the claimed partnership status of two foreign banks. Those banks had allegedly formed a partnership, known as Castle Harbour, LLC, with TIFD III-E, Inc. ("TIFD"), a subsidiary of General Electric Capital Corporation, with an intent to allocate certain income away from TIFD, an entity subject to United States income taxes, to the two foreign banks, which were not subject to such taxes. *Id.* at 223. Relying on the sham-transaction doctrine, the district court had rejected the IRS's contention that the foreign banks' interest was not a bona fide equity partnership participation "because, in addition to the strong and obvious tax motivations, the [partnership] had some additional non-tax motivation to raise equity capital." *Id.* at 231. In reversing the district court, the Second Circuit stated that it "[did] not mean to imply that it was error to consider the sham test, as the IRS purported to rely in part on that test. The error was in failing to test the banks' interest also under *Culbertson* after finding that the [partnership's] characterization survived the sham test." *Id.* The Second Circuit focused primarily on the *Culbertson* inquiry, and specifically on the IRS's contention that the foreign banks "should not be treated as equity partners in the Castle

56

Harbour partnership because they had no meaningful stake in the success or failure of the partnership." *Id.* at 224.

Applying the bona fide partner theory as embodied in *Culbertson*'s totality-of-the-circumstances test, the *Castle Harbour* court held that the banks' purported partnership interest was, in substance, "overwhelmingly in the nature of a secured lender's interest, which would neither be harmed by poor performance of the partnership nor significantly enhanced by extraordinary profits." *Id.* at 231. Although it acknowledged that the banks' interest "was not totally devoid of *indicia* of an equity participation in a partnership," the Court said that those indicia "were either illusory or insignificant in the overall context of the banks' investment," and, thus, "[t]he IRS appropriately rejected the equity characterization." *Id.*

The *Castle Harbour* court observed that "consider[ing] whether an interest has the prevailing character of debt or equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a bona fide equity participation." *Id.* at 232. In differentiating between debt and equity, it counseled that "the significant factor … [is] whether the funds were advanced with reasonable expectation of repayment regardless of the success of the venture or were placed at the risk of the business." *Id.* (citation and internal quotation marks omitted). Thus, in determining whether the banks' interest was a bona fide equity participation, the Second Circuit focused both on the banks' lack of downside risk and lack of upside potential in the partnership. It agreed with the "district court['s] recogni[tion] that the banks ran no meaningful risk of being paid anything less than the reimbursement of their investment at the [agreed-upon rate]

of return." *Id.* at 233. In support of that finding, the Court noted that:

> [TIFD] was required … to keep … high-grade commercial paper or cash, in an amount equal to 110% of the current value of the [amount that the banks would receive upon dissolution of the partnership.] The partnership, in addition, was obliged for the banks' protection to maintain $300 million worth of casualty-loss insurance. Finally, and most importantly, [General Electric Capital Corporation] – a large and very stable corporation – gave the banks its personal guaranty, which effectively secured the partnership's obligations to the banks.

*Id.* at 228.

Regarding upside potential, however, the Second Circuit disagreed with the district court's conclusion that the banks had a "meaningful and unlimited share of the upside potential." *Id.* at 233. That conclusion could not be credited because it "depended on the fictions projected by the partnership agreement, rather than on assessment of the practical realities." *Id.* at 234. Indeed, the Second Circuit stated that "[t]he realistic possibility of upside potential – not the absence of formal caps – is what governs this analysis." *Id.* In reality, "the banks enjoyed only a narrowly circumscribed ability to participate in profits in excess of" the repayment of its investment, *id.*, because TIFD had the power to either effectively restrict the banks' share of profits at 1% above an agreed-upon return of $2.85 million, or to buy out their interest at any time at a "negligible cost" of

approximately \$150,000, *id.* at 226, 235.  The return on the banks' initial investment of \$117.5 million was thus limited to \$2.85 million plus 1% – "a relatively insignificant incremental return over the projected eight-year life of the partnership," *id.* at 235.  In sum, "look[ing] not so much at the labels used by the partnership but at true facts and circumstances," as *Culbertson* directs, the *Castle Harbour* court was "compel[led] [to] conclu[de] that the … banks' interest was, for tax purposes, not a bona fide equity participation." *Id.* at 241.

The second, more recent, precedent that the Commissioner directs us to as a "guidepost" is *Virginia Historic Tax Credit Fund 2001 LP v. Commissioner*, 639 F.3d 129 (4th Cir. 2011) (hereinafter "*Virginia Historic*").  There, the United States Court of Appeals for the Fourth Circuit held that certain transactions between a partnership and its partners which sought to qualify for tax credits under the Commonwealth of Virginia's Historic Rehabilitation Credit Program (the "Virginia Program")[51] were, in substance, sales of those credits which resulted in taxable income to the partnership.  *Id.* at 132.  In *Virginia Historic*, certain investment funds (the "Funds") were structured "as

---

[51] The Virginia Program, much like the federal HRTC statute, was enacted to encourage investment in renovating historic properties.  *Virginia Historic*, 639 F.3d at 132.  Similar to federal HRTCs, the credits under the Virginia Program could be applied to reduce a taxpayer's Virginia income tax liability, dollar-for-dollar, up to 25% of eligible expenses incurred in rehabilitating the property.  *Id.*  Also like federal HRTCs, credits under the Virginia program could not be sold or transferred to another party.  *Id.* at 132-33.

partnerships that investors could join by contributing capital." *Id.* at 133. Through four linked partnership entities with one "source partnership" entity (the "Source Partnership"), "[t]he Funds would use [the] capital [provided by investors] to partner with historic property developers ["Operating Partnerships"] renovating smaller projects, in exchange for state tax credits." *Id.* The confidential offering memorandum given to potential investors provided that, "[f]or every $.74-$.80 contributed by an investor, [one of the] Fund[s] would provide the investor with $1 in tax credits. If such credits could not be obtained, the partnership agreement promised a refund of capital to the investor, net of expenses." *Id.* at 134 (citation and internal quotation marks omitted). Additionally, "the partnership agreement stated that the Funds would invest only in completed projects, thereby eliminating a significant area of risk" to the investors. *Id.* "[T]he Funds reported the money paid to Operating Partnerships in exchange for tax credits as partnership expenses and reported the investors' contributions to the Funds as nontaxable contributions to capital." *Id.* at 135.

The IRS "challenged [the Funds'] characterization of investors' funding as 'contributions to capital'" because the IRS believed that the investors were, in substance, purchasers of state income tax credits, and thus the money that the Funds received from the investors should have been reported as taxable income. *Id.* At trial, the Commissioner supported his position with two theories. First, he relied on the substance-over-form doctrine, saying that the investors were not bona fide partners in the Funds but were instead purchasers; and, second, he said that the transactions between the investors and the partnerships were "disguised sales" under I.R.C.

§ 707.[52]  *Id.* at 136.  The Tax Court rejected both of those assertions, and found that the investors were partners in the Funds for federal tax purposes.  *Id.* at 136-37.

The Fourth Circuit reversed the Tax Court. "Assuming, without deciding, that a 'bona fide' partnership existed," the *Virginia Historic* court found that "the Commissioner properly characterized the transactions at issue as 'sales'" under the disguised-sale rules.  *Id.* at 137.  The Fourth Circuit first turned to the regulations that provide guidance in determining whether a disguised sale has occurred.  *See id.* at 137-39 (citing to, *inter alia*, Treas. Reg. §§ 1.707-3, 1.707-6(a)).  Specifically, it explained that a transaction should be reclassified as a sale if, based on all the facts and circumstances, (1) a partner would not have transferred money to the partnership but for the transfer of property – the receipt of tax credits – to the partner; and (2)

---

[52] Under I.R.C. § 707(a)(2)(A),

[i]f (i) a partner performs services for a partnership or transfers property to a partnership, (ii) there is a related direct or indirect allocation and distribution to such partner, and (iii) the performance of such services (or such transfer) and the allocation and distribution, when viewed together, are properly characterized as a transaction occurring between the partnership and a partner acting other than in his capacity as a member of the partnership, such allocation and distribution shall be treated as a transaction [between the partnership and one who is not a partner].

the latter transfer – the receipt of tax credits – "is not dependent on the entrepreneurial risks of partnership operations." *Id.* at 145 (quoting Treas. Reg. § 1.707-3(b)(1)). The Fourth Circuit concluded that the risks cited by the Tax Court – such as the "risk that developers would not complete their projects on time because of construction, zoning, or management issues," "risk … [of] liability for improper construction," and "risk of mismanagement or fraud at the developer partnership level" – "appear[ed] both speculative and circumscribed." *Id.* While the Fourth Circuit acknowledged that "there was … no guarantee that resources would remain available in the source partnership to make the promised refunds," it determined "that the Funds were structured in such a way as to render the possibility of insolvency remote." *Id.*

In holding "that there was no true entrepreneurial risk faced by investors" in the transactions at issue, the *Virginia Historic* court pointed to several different factors:

> First, investors were promised what was, in essence, a fixed rate of return on investment rather than any share in partnership profits tied to their partnership interests. … Second, the Funds assigned each investor an approximate .01% partnership interest and explicitly told investors to expect no allocations of material amounts of … partnership items of income, gain, loss or deduction. Third, investors were secured against losing their contributions by the promise of a refund from the Funds if tax credits could not be delivered or were revoked.

And fourth, the Funds hedged against the possibility of insolvency by promising investors that contributions would be made only to completed projects and by requiring the Operating Partnerships to promise refunds, in some cases backed by guarantors, if promised credits could not be delivered.

*Id.* (internal citations and quotation marks omitted). In sum, the Fourth Circuit deemed "persuasive the Commissioner's contention that the only risk … was that faced by any advance purchaser who pays for an item with a promise of later delivery. It [was] not the risk of the entrepreneur who puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink." *Id.* at 145-46 (citing *Tower*, 327 U.S. at 287; Staff of J. Comm. on Tax'n, 98th Cong., 2d Sess., *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984*, at 226 ("To the extent that a partner's profit from a transaction is assured without regard to the success or failure of the joint undertaking, there is not the requisite joint profit motive." (alteration in original))). Accordingly, it agreed with the Commissioner that the Funds should have reported the money received from the investors as taxable income. *Id.* at 146.

The Fourth Circuit concluded its opinion with an important note regarding its awareness of the legislative policy of providing tax credits to spur private investment in historic rehabilitation projects:

We reach this conclusion mindful of the fact that it is "the policy of the Federal Government" to "assist State and local

63

governments … to expand and accelerate their historic preservation programs and activities." 16 U.S.C. § 470-1(6).  And we find no fault in the Tax Court's conclusion that both the Funds and the Funds' investors engaged in the challenged transactions with the partial goal of aiding Virginia's historic rehabilitation efforts. But Virginia's Historic Rehabilitation Program is not under attack here.

*Id.* at 146 n.20.

## C.    *Application of the Guideposts to HBH*

The Commissioner asserts that *Castle Harbour* and *Virginia Historic* "provide a highly pertinent frame of reference for analyzing the instant case."  (Appellant's Opening Br. at 40.)  According to the Commissioner, "[m]any of the same factors upon which the [*Castle Harbour* court] relied in finding that the purported bank partners … were, in substance, lenders to the GE entity also support the conclusion that [PB] was, in substance, not a partner in HBH but, instead, was a purchaser of tax credits from HBH."[53] (*Id.*)    That is so, says the Commissioner, because, as confirmed by the *Virginia Historic* court's reliance on the

---

[53] The Commissioner acknowledges that "[a]lthough certain aspects of [PB's] cash investment in HBH were debt-like (*e.g.*, its 3-percent preferred return), this case does not fit neatly within the debt-equity dichotomy, since [PB] recovered its 'principal,' *i.e.* its purported capital contributions to HBH, in the form of tax credits rather than cash."  (Appellant's Opening Br. at 40 n.14.)

"entrepreneurial risks of partnership operations," Treas. Reg. § 1.707-3(b)(1), "the distinction between an equity contribution to a partnership … and a transfer of funds to a partnership as payment of the sales price of partnership property [, i.e., tax credits,]… is the same as the principal distinction between equity and debt" (Appellant's Opening Br. at 40-41). The key point is that the "recovery of an equity investment in a partnership is dependent on the entrepreneurial risks of partnership operations, whereas recovery of a loan to a partnership – or receipt of an asset purchased from a partnership – is not." (*Id.* at 41.) In other words, "an equity investor in a partnership (*i.e.*, a bona fide partner) has a meaningful stake in the success or failure of the enterprise, whereas a lender to, or purchaser from, the partnership does not." (*Id.*) In sum, the Commissioner argues that, just as the banks in *Castle Harbour* had no meaningful stake in their respective partnerships, and the "investors" in *Virginia Historic* were more like purchasers than participants in a business venture, "it is clear from the record in this case that [PB] had no meaningful stake in the success or failure of HBH." (*Id.*)

In response, HBH asserts that "[t]here are a plethora of errors in the IRS's tortured effort … to apply *Castle Harbour* and *Virginia Historic* … to the facts of the present case." (Appellee's Br. at 38.) First, HBH argues that it is "abundantly apparent" that *Castle Harbour* "is completely inapposite" to it because the actual provisions in Castle Harbour's partnership agreement that minimized the banks' downside risk and upside potential were more limiting than the provisions in the AREA. (Appellee's Br. at 35.) HBH contends that, unlike the partnership agreement in *Castle Harbour*, "[PB] has *no* rights under the AREA to compel

65

HBH to repay all or any part of its capital contribution," PB's 3% Preferred Return was "not guaranteed," and "NJSEA has no … right to divest [PB] of its interest in any income or gains from the East Hall."  (*Id*.)

As to *Virginia Historic*, HBH argues that it "has no application whatsoever" here.  (*Id.* at 38.)  It reasons that the decision in that case "assumed that valid partnerships existed as a necessary condition to applying I.R.C. § 707(b)'s disguised sale rules" (*id.* at 36), and that the case was "analyzed … *solely* under the disguised sale regime" – which is not at issue in the FPAA sent to HBH (*id.* at 38).

Overall, HBH characterizes *Castle Harbour* and *Virginia Historic* as "pure misdirections which lead to an analytical dead end" (*id.* at 32), and emphasizes that "[t]he question … *Culbertson* asks is simply whether the parties intended to conduct a business together and share in the profits and losses therefrom" (*id.* at 39).  We have no quarrel with how HBH frames the *Culbertson* inquiry.  But what HBH fails to recognize is that resolving whether a purported partner had a "meaningful stake in the success or failure of the partnership," *Castle Harbour*, 459 F.3d at 224, goes to the core of the ultimate determination of whether the parties "'intended to join together in the present conduct of the enterprise,'" *id.* at 232 (quoting *Culbertson*, 337 U.S. at 742).  *Castle Harbour*'s analysis that concluded that the banks' "*indicia* of an equity participation in a partnership" was only "illusory or insignificant," *id.* at 231, and *Virginia Historic*'s determination that the limited partner investors did not face the "entrepreneurial risks of partnership operations," 639 F.3d at 145 (citation and internal quotation marks omitted), are both highly relevant to the question of whether HBH was a

66

partnership in which PB had a true interest in profit and loss,[54] and the answer to that question turns on an assessment

---

[54] We reject, moreover, any suggestion that the disguised-sale rules and the bona fide-partner theory apply in mutually exclusive contexts. *Virginia Historic* did not "assume[] that valid partnerships existed as a necessary condition" prior to applying the disguised-sale rules. (Appellee's Br. at 36.) Rather, as the *Virginia Historic* court observed, "[t]he Department of the Treasury specifically contemplates that its regulations regarding disguised sales can be applied *before* it is determined whether a valid partnership exists." 639 F.3d at 137 n.9 (citing Treas. Reg. § 1.707-3).

More importantly, HBH simply ignores why many of the principles espoused in *Virginia Historic* are applicable here. It is true that the challenged transaction here does not involve state tax credits and that the IRS has not invoked the disguised-sale rules, but distinguishing the case on those grounds fails to address the real issue. *Virginia Historic* is telling because the disguised-sale analysis in that case "touches on the same risk-reward analysis that lies at the heart of the bona fide-partner determination." (Appellant's Reply Br. at 9.) Under the disguised-sale regulations, a transfer of "property … by a partner to a partnership" and a "transfer of money or other consideration … by the partnership to the partner" will be classified as a disguised sale if, based on the facts and circumstances, "(i) [t]he transfer of money or other consideration would not have been made but for the transfer of property; and (ii) [i]n cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations." Treas. Reg. § 1.707-3(b)(1).

---

Thus, the disguised-sale analysis includes an examination of "whether the benefit running from the partnership to the person allegedly acting in the capacity of a partner is 'dependent upon the entrepreneurial risks of partnership operations.'" (Appellant's Reply Br. at 9 (quoting Treas. Reg. § 1.707-3(b)(1)(ii)).) That entrepreneurial risk issue also arises in the bona fide-partner analysis, which focuses on whether the partner has a meaningful stake in the profits and losses of the enterprise. Moreover, many of the facts and circumstances laid out in the pertinent treasury regulations that "tend to prove the existence of a [disguised] sale," Treas. Reg. § 1.707-3(b)(2), are also relevant to the bona fide-partner analysis here. *See, e.g.*, *id.* § 1.707-3(b)(2)(i) ("That the timing and amount of a subsequent transfer [i.e., the HRTCs] are determinable with reasonable certainty at the time of an earlier transfer [i.e., PB's capital contributions];"); *id.* § 1.707-3(b)(2)(iii) ("That the partner's [i.e., PB's] right to receive the transfer of money or other consideration [i.e., the HRTCs] is secured in any manner, taking into account the period during which it is secured;"); *id.* § 1.707-3(b)(2)(iv) ("That any person [i.e., NJSEA] has made or is legally obligated to make contributions [e.g., the Tax Benefits Guaranty] to the partnership in order to permit the partnership to make the transfer of money or other consideration [i.e., the HRTCs];"); *id.* § 1.707-3(b)(2)(v) ("That any person [i.e., NJSEA] has loaned or has agreed to loan the partnership the money or other consideration [e.g., Completion Guaranty, Operating Deficit Guaranty] required to enable the partnership to make the transfer, taking into account whether any such lending obligation is subject to contingencies related to the results of partnership operations;"). Although we are not suggesting

of risk participation. We are persuaded by the Commissioner's argument that PB, like the purported bank partners in *Castle Harbour*, did not have any meaningful downside risk or any meaningful upside potential in HBH.

### 1. *Lack of Meaningful Downside Risk*

PB had no meaningful downside risk because it was, for all intents and purposes, certain to recoup the contributions it had made to HBH and to receive the primary benefit it sought– the HRTCs or their cash equivalent. First, any risk that PB would not receive HRTCs in an amount that was at least equivalent to installments it had made to-date (i.e., the "Investment Risk") was non-existent. That is so because, under the AREA, PB was not required to make an installment contribution to HBH until NJSEA had verified that it had achieved a certain level of progress with the East Hall renovation that would generate enough cumulative HRTCs to at least equal the sum of the installment which was then to be contributed and all prior capital contributions that had been made by PB. (*See* J.A. at 176, 242 (first installment of $650,000 due at closing was paid when NJSEA had already incurred over $53 million of QREs which would generate over $10 million in HRTCs); *id.* at 176-77 (second installment, projected to be $7,092,588, was not due until, among other events, a projection of the HRTCs for 2000 (which were estimated at closing to be $7,789,284) based on

that a disguised-sale determination and a bona fide-partner inquiry are interchangeable, the analysis pertinent to each look to whether the putative partner is subject to meaningful risks of partnership operations before that partner receives the benefits which may flow from that enterprise.

a "determination of the actual rehabilitation costs of [HBH] that qualify for Tax Credits in 2000"); *id.* at 177 (third installment, projected to be $8,523,630, was not due until the later of, among other events, (1) "evidence of Substantial Completion of Phase 4 … ."; and (2) a projection of the HRTCs for 2001 (which were estimated at closing to be $11,622,889) based on a "determination of the actual rehabilitation costs of [HBH] that qualify for Tax Credits in 2001"); *id.* (fourth installment, projected to be $1,929,580, was not due until, among other events, PB received a "K-1 for 2001 evidencing the actual Tax Credits for 2001," a tax document that would not have been available until after the estimated completion date of the entire project).) While PB did not have the contractual right to "compel HBH to repay all or any part of its capital contribution" (Appellee's Br. at 35), PB had an even more secure deal. Even before PB made an installment contribution, it knew it would receive at least that amount in return.

Second, once an installment contribution had been made, the Tax Benefits Guaranty eliminated any risk that, due to a successful IRS challenge in disallowing any HRTCs, PB would not receive at least the cash equivalent of the bargained-for tax credits (i.e., the "Audit Risk"). The Tax Benefits Guaranty obligated NJSEA[55] to pay PB not only the amount of tax credit disallowed, but also any penalties and interest, as well as up to $75,000 in legal and administrative expenses incurred in connection with such a challenge, and

---

[55] Although HBH was the named obligor under the Tax Benefits Guaranty, the agreement provided that "NJSEA … shall fund any obligations of [HBH] to [PB]" under the Tax Benefits Guaranty. (J.A. at 303.)

70

the amount necessary to pay any tax due on those reimbursements. *Cf. Virginia Historic*, 639 F.3d at 145 (noting the fact that "investors were secured against losing their contributions by the promise of a refund from the Funds if tax credits could not be delivered or were revoked" "point[ed] to the conclusion that there was no true entrepreneurial risk faced by investors").

Third, any risk that PB would not receive all of its bargained-for tax credits (or cash equivalent through the Tax Benefits Guaranty) due to a failure of any part of the rehabilitation to be successfully completed (i.e., the "Project Risk") was also effectively eliminated because the project was already fully funded before PB entered into any agreement to provide contributions to HBH. (*See* J.A. at 962 (statement in the Confidential Memorandum that "[t]he rehabilitation is being funded entirely by [NJSEA]"); *id.* at 1134 (notes from a NJSEA executive committee meeting in March 2000 indicating that "[t]he bulk of the Investor's equity is generally contributed to the company after the project is placed into service and the tax credit is earned, the balance when stabilization is achieved"); *id.* at 1714 (notes to NJSEA's 1999 annual report stating that the Casino Reinvestment Development Authority had "agreed to reimburse [NJSEA] [for] … all costs in excess of bond proceeds for the project").) That funding, moreover, included coverage for any excess development costs.[56] In other words,

---

[56] PB had no exposure to the risk of excess construction costs, as the Completion Guaranty in the AREA provided that NJSEA was obligated to pay all such costs. Additionally, even after the renovation was completed, PB need not worry about any operating deficits that HBH would

PB's contributions were not at all necessary for the East Hall project to be completed. *Cf. Virginia Historic*, 639 F.3d at 145 (noting that the fact that "the Funds hedged against the possibility of insolvency by promising investors that contributions would be made only to completed projects" "point[ed] to the conclusion that there was not true entrepreneurial risk faced by investors"). Furthermore, HBH's own accountants came to the conclusion that the source of the project's funds – NJSEA (backed by the Casino Reinvestment Development Authority) – was more than capable of covering any excess development costs incurred by the project, as well as any operating deficits of HBH, and NJSEA had promised that coverage through the Completion Guaranty and the Operating Deficit Guaranty, respectively, in the AREA. (*See* J.A. at 1638 (memo to audit file noting that, because "[NJSEA] has the ability to fund the [operating] deficits as a result of the luxury and other taxes provided by the hospitality and entertainment industry in the state," and "there is no ceiling on the amount of funds to be provided [by NJSEA to HBH]," "no triggering event [had occurred] which require[d] [a write down] under FASB 144").) *Cf. Virginia Historic*, 639 F.3d at 145 (noting that although "[i]t [was] true … there was … no guarantee that resources would remain available in the source partnership to make the promised refunds … it [was] also true that the Funds were structured in such a way as to render the possibility of insolvency remote").) Thus, although the Tax Court determined that PB

---

incur, as NJSEA promised to cover any such deficits through the Operating Deficit Guaranty. Furthermore, as detailed *infra* note 58, PB ran no real risk of incurring any environmental liability in connection with the East Hall renovation.

72

"faced the risk that the rehabilitation would not be completed" (J.A. at 43), the record belies that conclusion. Because NJSEA had deep pockets, and, as succinctly stated by Reznick, "there [was] no ceiling on the amount of funds to be provided [by NJSEA to HBH]" (*id.* at 1638), PB was not subject to any legally significant risk that the renovations would falter.[57]

In short, PB bore no meaningful risk in joining HBH, as it would have had it acquired a bona-fide partnership interest. *See ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 514 (D.C. Cir. 2000) (noting that the Tax Court did not err "by carving out an exception for de minimis risks" when assessing whether the parties assumed risk for the purpose of determining whether a partnership was valid for tax purposes, and determining that the decision not to consider de minimis risk was "consistent with the Supreme Court's view … that a transaction will be disregarded if it did 'not *appreciably* affect [taxpayer's] beneficial interest except to reduce his tax'"

_____

[57] Although the question of the existence of a risk is a factual issue we would review for clear error, there was certainly no error in acknowledging that there were risks associated with the rehabilitation. The relevant question, here, however, is not the factual one of whether there was risk; it is the purely the legal question of how the parties agreed to divide that risk, or, in other words, whether a party to the transactions bore any legally significant risk under the governing documents. That question – whether PB was subject to any legally meaningful risk in connection with the East Hall rehabilitation – depends on the AREA and related documents and hence is a question of law that we review *de novo*.

(alteration in original) (quoting *Knetsch v. United States*, 364 U.S. 361, 366 (1960))).[58]

PB's effective elimination of Investment Risk, Audit Risk, and Project Risk is evidenced by the "agreement … of the parties." *Culbertson*, 337 U.S. at 742. PB and NJSEA, in substance, did not join together in HBH's stated business purpose – to rehabilitate and operate the East Hall. Rather, the parties' focus from the very beginning was to effect a sale and purchase of HRTCs. (*See* J.A. at 691 (Sovereign's "consulting proposal … for the sale of historic rehabilitation tax credits expected to be generated" by the East Hall renovation); *id.* at 955 (Confidential Memorandum entitled "The Sale of Historic Tax Credits Generated by the Renovation of the Historic Atlantic City Boardwalk Convention Hall"); *id.* at 1143 (cover letter from Sovereign to NJSEA providing NJSEA "with four original investment offers from institutions that have responded to the

---

[58] The Tax Court thought that "[PB] faced potential liability for environmental hazards from the rehabilitation." (J.A. at 43.) Specifically, it theorized that PB could be on the hook for environmental liability (1) if environmental insurance proceeds did not cover any such potential liability, and (2) NJSEA was unable to cover that difference. In reality, however, PB was not subject to any real risk of environmental liability because of the Environmental Guaranty and the fact that PB had a priority distribution right to any environmental insurance proceeds that HBH received (HBH's counsel at oral argument indicated that HBH carried a $25 million policy). Moreover, PB received a legal opinion that it would not be subject to any environmental liability associated with the East Hall renovation.

[Confidential] Memorandum regarding the purchase of the historic tax credits expected to be generated by" the East Hall renovation).)[59]

That conclusion is not undermined by PB's receipt of a secondary benefit – the 3% Preferred Return on its contributions to HBH. Although, in form, PB was "not guaranteed" that return on an annual basis if HBH did not generate sufficient cash flow (Appellee's Br. at 35), in substance, PB had the ability to ensure that it would eventually receive it. If PB exercised its Put Option (or NJSEA exercised its Call Option), the purchase price to be paid by NJSEA was effectively measured by PB's accrued and unpaid Preferred Return. *See infra* note 63 and accompanying text. And to guarantee that there would be sufficient cash to cover that purchase price, NJSEA was required to purchase the Guaranteed Investment Contract in the event that NJSEA exercised its Call Option.[60] *Cf. Virginia Historic*, 639 F.3d at 145 (noting the fact that "investors were promised what was, in essence, a fixed rate of

---

[59] Although we do not "[p]ermit[] a taxpayer to control the economic destiny of a transaction with labels" when conducting a substance-over-form inquiry, *Schering-Plough, Corp. v. United States*, 651 F. Supp. 2d 219, 242 (D.N.J. 2009), the labels chosen are indicative of what the parties were trying to accomplish and thus those labels "throw[] light on [the parties'] true intent," *Culbertson*, 337 U.S. at 742.

[60] As noted *supra* in Section I.B.4.a, the Guaranteed Investment Contract was "sized to pay off" the accrued but unpaid Preferred Return, as well as the outstanding balance on the Investor Loan with accrued interest. (J.A. at 1211.)

75

return on investment rather than any share in partnership profits tied to their partnership interests" "point[ed] to the conclusion that there was not true entrepreneurial risk faced by investors"). Thus, the Tax Court's finding that PB "might not receive its preferred return … at all" unless NJSEA exercised its Call Option (J.A. at 51-52), was clearly erroneous because it ignored the reality that PB could assure its return by unilaterally exercising its Put Option.[61]

HBH, of course, attacks the Commissioner's assertion that PB lacked downside risk, claiming that "the IRS's theory that a valid partnership cannot exist unless an investor-partner shares in all of the risks and costs of the partnership has no basis in partnership or tax law," and "is contrary to the standard economic terms of innumerable real estate investment partnerships in the United States for every type of real estate project." (Appellee's Br. at 44.) HBH also asserts that many of the negotiated provisions – such as the Completion Guaranty, Operating Deficit Guaranty, and the Preferred Return – are "typical in a real estate investment partnership." (*Id.* at 45.) The Commissioner has not claimed, however, and we do not suggest, that a limited partner is prohibited from capping its risk at the amount it invests in a partnership. Such a cap, in and of itself, would not jeopardize its partner status for tax purposes. We also recognize that a limited partner's status as a bona fide equity participant will

---

[61] It is true, of course, that PB could not exercise its Put Option until seven years from the date that the East Hall was placed in service. However, PB would have no interest in exercising that option within the first five years anyway because the HRTCs that PB received would be subject to recapture during that period. *See supra* note 20.

not be stripped away merely because it has successfully negotiated measures that minimize its risk of losing a portion of its investment in an enterprise. Here, however, the parties agreed to shield PB's "investment" from any meaningful risk. PB was assured of receiving the value of the HRTCs and its Preferred Return regardless of the success or failure of the rehabilitation of the East Hall and HBH's subsequent operations. And that lack of meaningful risk weighs heavily in determining whether PB is a bona fide partner in HBH. *Cf. Virginia Historic*, 639 F.3d at 145-46 (explaining that "entrepreneurial risks of partnership operations" involves placing "money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink"); *Castle Harbour*, 459 F.3d at 232 (noting that "Congress appears to have intended that 'the significant factor' in differentiating between [debt and equity] be whether 'the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business'" (quoting *Gilbert v. Comm'r*, 248 F.2d 399, 406 (2d Cir. 1957))).

### 2. *Lack of Meaningful Upside Potential*

PB's avoidance of all meaningful downside risk in HBH was accompanied by a dearth of any meaningful upside potential. "Whether [a putative partner] is free to, and does, enjoy the fruits of the partnership is strongly indicative of the reality of his participation in the enterprise." *Culbertson*, 337 U.S. at 747. PB, in substance, was not free to enjoy the fruits of HBH. Like the foreign banks' illusory 98% interest in *Castle Harbour*, PB's 99.9% interest in HBH's residual cash flow gave a false impression that it had a chance to share in potential profits of HBH. In reality, PB would only benefit

77

from its 99.9% interest in residual cash flow after payments to it on its Investor Loan and Preferred Return and the following payments to NJSEA: (1) annual installment payment on the Acquisition Loan ($3,580,840 annual payment for 39 years plus arrears); (2) annual installment payment on the Construction Loan;[62] and (3) payment in full of the operating deficit loan (in excess of $28 million as of 2007). Even HBH's own rosy financial projections from 2000 to 2042, which (at least through 2007) had proven fantastically inaccurate, forecasted no residual cash flow available for distribution. Thus, although in form PB had the potential to receive the fair market value of its interest (assuming such value was greater than its accrued but unpaid Preferred Return) if either NJSEA exercised its Call Option or PB exercised its Put Option, in reality, PB could never expect to share in any upside.[63] *Cf. Castle Harbour*, 459 F.3d at 234

---

[62] The Construction Loan called for annual interest-only payments until April 30, 2002, and thereafter, called for annual installments of principal and interest that would fully pay off the amount of the principal as then had been advanced by April 30, 2040. Under the original principal amount of $57,215,733 with an interest rate of 0.1% over a 39-year period, and assuming no arrearage in the payment of principal and interest, the annual installment of principal and interest would be approximately $1.5 million.

[63] To put it mildly, the parties and their advisors were imaginative in creating financial projections to make it appear that HBH would be a profit-making enterprise. For example, after Sovereign said that it was "cautious about [Spectacor's projections of net losses for HBH since] they might prove excessively conservative" (J.A. at 793), and suggested that NJSEA "could explore shifting the burden of some of

[HBH's] operating expenses … to improve results" (*id.* at 804), Spectacor made two sets of revisions to HBH's five-year draft projections that turned an annual average $1.7 million net operating loss to annual net operating gains ranging from $716,000 to $1.24 million by removing HBH's projected utilities expenses for each of the five years. Similarly, when an accountant from Reznick informed Hoffman that the two proposed loans from NJSEA to HBH "ha[d] been set up to be paid from available cash flow" but that "[t]here was not sufficient cash to amortize this debt" (*id.* at 1160),  Hoffman instructed that accountant to remedy that issue by increasing the projection of baseline revenues in 2002 by $1 million by adding a new revenue source of $750,000 titled "naming rights," and by increasing both "parking revenue" and "net concession revenue" by $125,000 each (*id.* at 1196).  Overall, although Reznick projected near closing that HBH would generate an aggregate net operating income of approximately $9.9 million for 2003 through 2007, HBH actually experienced an aggregate net operating loss of over $10.5 million for those five years.

Despite the smoke and mirrors of the financial projections, the parties' behind-the-scenes statements reveal that they never anticipated that the fair market value of PB's interest would exceed PB's accrued but unpaid Preferred Return. (*See id.* at 1162 (pre-closing memo from NJSEA's outside counsel to NJSEA that "[d]ue to the structure of the transaction," the fair market value would not come into play in determining the amount that PB would be owed if NJSEA exercised its Call Option).)  That admission is hardly surprising because the substance of the transaction indicated that this was not a profit-generating enterprise. *Cf. Virginia Historic*, 639 F.3d at 145 (noting that the fact that "the Funds

79

("The realistic possibility of upside potential – not the absence of formal caps – is what governs [the bona fide equity participation] analysis."). Even if there were an upside, however, NJSEA could exercise its Consent Option, and cut PB out by paying a purchase price unrelated to any fair market value.[64] *See supra* Section I.B.4.a. In sum, "the structure of the … transaction ensured that [PB] would never receive any [economic benefits from HBH]." *Southgate Master Fund*, 659 F.3d at 486-87. And "[i]n light of *Culbertson*'s identification of 'the actual control of income and the purposes for which it [was] used' as a metric of a partnership's legitimacy, the terms of the [AREA and the structure of the various options] constitute compelling evidence" that PB was not a bona fide partner in HBH. *Id.* at 486 (quoting *Culbertson*, 337 U.S. at 742).

### 3. *HBH's Reliance on Form over Substance*

After attempting to downplay PB's lack of any meaningful stake in the success or failure of the enterprise, HBH presses us to consider certain evidence that it believes "overwhelmingly proves that [PB] is a partner in HBH" under

---

… explicitly told investors to expect no allocation of material amounts of … partnership items of income, gain, loss, or deduction" "point[ed] to the conclusion that there was no true entrepreneurial risk faced by investors" (citation and internal quotation marks omitted)).

[64] Thus, contrary to HBH's assertion, NJSEA effectively did have the "right to divest [PB] of its interest in any income or gains from the East Hall." (Appellee's Br. at 35.)

80

the *Culbertson* totality-of-the-circumstances test. (Appellee's Br. at 38.) That "overwhelming" evidence includes: (1) that HBH was duly organized as an LLC under New Jersey law and, as the AREA provides, "was formed to acquire, develop, finance, rehabilitate, maintain, operate, license, and sell or otherwise to dispose of the East Hall" (*id.* at 40; *see* J.A. at 157); (2) PB's "net economic benefit" from the HRTCs and the 3% Preferred Return (Appellee's Br. at 41); (3) PB's representatives' "vigorous[] negotiat[ion] [of] the terms of the AREA" (*id.* at 41); (4) "the nature and thoroughness" of PB's "comprehensive due diligence investigation in connection with its investment in HBH" (*id.* at 42); (5) PB's "substantial financial investment in HBH" (*id.*); (6) various business agreements that had been entered into between NJSEA and certain third parties that were all assigned to, and assumed by, HBH (*id.* at 43); (7) bank and payroll accounts that were opened in HBH's name and insurance agreements that were amended to identify HBH as an owner and include PB as an additional insured; and (8) the fact that, following closing, "NJSEA kept in constant communication with [PB] regarding the renovations to the East Hall, and the business operations of the Hall" (*id.*).

Much of that evidence may give an "outward appearance of an arrangement to engage in a common enterprise." *Culbertson*, 337 U.S. at 752 (Frankfurter, J., concurring). But "the sharp eyes of the law" require more from parties than just putting on the "habiliments of a partnership whenever it advantages them to be treated as partners underneath." *Id*. Indeed, *Culbertson* requires that a partner "*really and truly intend*[] to … shar[e] in the profits and losses" of the enterprise, *id.* at 741 (majority opinion) (emphasis added) (citation and internal quotation marks

omitted), or, in other words, have a "meaningful stake in the success or failure" of the enterprise, *Castle Harbour*, 459 F.3d at 231. Looking past the outward appearance, HBH's cited evidence does not demonstrate such a meaningful stake.

First, the recitation of partnership formalities – that HBH was duly organized, that it had a stated purpose under the AREA, that it opened bank and payroll accounts, and that it assumed various obligation – misses the point. We are prepared to accept for purposes of argument that there was economic substance to HBH. The question is whether PB had a meaningful stake in that enterprise. *See Castle Harbour*, 459 F.3d at 232 ("The IRS's challenge to the taxpayer's characterization is not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective."); *Southgate Master Fund*, 659 F.3d at 484 ("The fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny [under *Culbertson*]. The parties' selection of the partnership form must have been driven by a genuine business purpose." (internal footnote omitted)). To answer that, we must "look beyond the superficial formalities of a transaction to determine the proper tax treatment." *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 436 (5th Cir. 1998) (citation and internal quotation marks omitted).

Second, evidence that PB received a "net economic benefit" from HBH and made a "substantial financial investment in HBH" can only support a finding that PB is a bona fide partner if there was a meaningful intent to share in the profits and the losses of that investment. The structure of PB's "investment," however, shows clearly that there was no

such intent. Recovery of each of the contributions that made up the "substantial financial investment" was assured by the provisions of the AREA and the Tax Benefits Guaranty. And, as the Commissioner rightly notes, PB's net after-tax economic benefit from the transaction – in the form of the HRTCs (or the cash equivalent via the Tax Benefits Guaranty) and the effectively guaranteed Preferred Return – "merely demonstrates [PB's] intent to make an economically rational use of its money on an after-tax basis." (Appellant's Reply Br. at 13.) Indeed, both parties in a transaction such as this one will always think they are going to receive a net economic benefit; otherwise, the transaction would never occur. If in fact that was the test, there would be a green-light for every tax-structured transaction that calls itself a "partnership."

Third, the fact that NJSEA "kept in constant communication" regarding the East Hall is hardly surprising. As discussed earlier, *supra* Section II.C.1, each installment contribution from PB was contingent upon NJSEA verifying that a certain amount of work had been completed on the East Hall so that PB was assured it would not be contributing more money than it would be guaranteed to receive in HRTCs or their cash equivalent. The mere fact that a party receives regular updates on a project does not transform it into a bona fide partner for tax purposes.

Fourth, looking past the form of the transaction to its substance, neither PB's "vigorous[] negotiat[ion]" nor its "comprehensive due diligence investigation" is, in this context, indicative of an intent to be a bona fide partner in HBH. We do not doubt that PB spent a significant amount of time conducting a thorough investigation and negotiating

favorable terms. And we acknowledge that one of the factors cited by *Culbertson* is "the conduct of the parties in execution of its provisions." 337 U.S. at 742. But the record reflects that those efforts were made so that PB would not be subject to any real risks that would stand in the way of its receiving the value of the HRTCs; not, as HBH asserts, "to form a true business relationship." (Appellee's Br. at 41.) We do not believe that courts are compelled to respect a taxpayer's characterization of a transaction for tax purposes based on how document-intensive the transaction becomes. Recruiting teams of lawyers, accountants, and tax consultants does not mean that a partnership, with all its tax credit gold, can be conjured from a zero-risk investment of the sort PB made here.

In the end, the evidence HBH cites focuses only on form, not substance. From the moment Sovereign approached NJSEA, the substance of any transaction with a corporate investor was calculated to be a "sale of … historic rehabilitation tax credits." (J.A. at 691.) *Cf. Castle Harbour*, 459 F.3d at 236 (finding that the banks' interest "was more in the nature of window dressing designed to give ostensible support to the characterization of equity participation … than a meaningful stake in the profits of the venture"). And in the end, that is what the substance turned out to be.

Like the *Virginia Historic* court, we reach our conclusion mindful of Congress's goal of encouraging rehabilitation of historic buildings. *See* 639 F.3d at 146 n.20. We have not ignored the predictions of HBH and amici that, if we reallocate the HRTCs away from PB, we may jeopardize the viability of future historic rehabilitation projects. Those forecasts, however, distort the real dispute.

84

The HRTC statute "is not under attack here." *Id*. It is the prohibited sale of tax credits, not the tax credit provision itself, that the IRS has challenged. Where the line lies between a defensible distribution of risk and reward in a partnership on the one hand and a form-over-substance violation of the tax laws on the other is not for us to say in the abstract. But, "[w]here, as here, we confront taxpayers who have taken a circuitous route to reach an end more easily accessible by a straightforward path, we look to the substance over form." *Southgate Master Fund*, 659 F.3d at 491 (citation and internal quotation marks omitted). And, after looking to the substance of the interests at play in this case, we conclude that, because PB lacked a meaningful stake in either the success or failure of HBH, it was not a bona fide partner.

## III.  Conclusion

For the foregoing reasons, we will reverse the Tax Court's January 3, 2011 decision, and remand the case for further proceedings consistent with this opinion.